This decision has been published in *Ohio Official Reports* at 174 Ohio St.3d 574.

IN RE T.D.S.

[Cite as *In re T.D.S.*, 2024-Ohio-595.]

*Admissibility of evidence—Statements made by juvenile after he was read his* Miranda *rights were properly admitted at trial because he knowingly, intelligently, and voluntarily waived his rights—Court of appeals' judgment affirmed.*

(No. 2022-0359—Submitted May 3, 2023—Decided February 21, 2024.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 110471, 2022-Ohio-525.

_____

DETERS, J.

{¶ 1} T.D.S., a juvenile, contends that the juvenile court should have granted a motion to suppress all the statements that he made to police officers when they were investigating the homicide of another juvenile. After reviewing the totality of the circumstances surrounding T.D.S.'s statements, the Eighth District Court of Appeals concluded that T.D.S. had waived his *Miranda* rights knowingly, intelligently, and voluntarily. We agree, so we affirm the judgment of the court of appeals.

## I. BACKGROUND

{¶ 2} In September 2019, Cleveland police officer Luther Roddy and his partner responded to a report of shots fired in an apartment building. While searching the building, the officers discovered a male juvenile—later identified as 14-year-old S.G.—with a gunshot wound to his chest and one to his leg. S.G. later died of his injuries. Based on information received from a high-school principal, police investigators' attention turned to T.D.S., who was then 15 years old.

**{¶ 3}** Detectives Aaron Reese, Michael Legg, and Luis Rivera went to T.D.S.'s mother's house to ask T.D.S. about the shooting. The encounter in the house, which lasted an hour and 37 minutes, was captured on Detective Rivera's body-worn camera. After getting permission from T.D.S.'s mother, Detective Reese asked T.D.S. where he had been on the day S.G. was shot.

**{¶ 4}** Initially, T.D.S. denied having been at the apartment building where S.G. was found and challenged the detectives' assertions that a person matching his description had been seen leaving the building. But after about 35 minutes of questioning by the detectives, T.D.S. asked whether he and the detectives could go somewhere else. In response, his mother left the room (but remained close-by), and Detective Legg also left. T.D.S. then told Detective Reese that he, S.G., and a third person had been in the building and that the third person had had a gun. T.D.S. repeatedly told the detectives this version of the story, and he continued to deny that he was the person whom witnesses had seen leaving the building. He maintained that the third person had shot the gun.

**{¶ 5}** Upon further questioning by the detectives, T.D.S. told them that he had accidentally shot S.G. while playing with a gun. He also agreed to show Detective Reese where he had thrown the gun after he had left the building. After these statements, Detective Reese told T.D.S. that he was going to read him his rights. The detective asked T.D.S.'s mother to sit by the juvenile. After Detective Reese informed T.D.S. of his rights under *Miranda*, the detective asked him whether he understood. *See Miranda v. Arizona,* 384 U.S. 436, 466, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). T.D.S. nodded his head.

**{¶ 6}** The remainder of the recording—about 30 minutes—shows Detectives Reese and Rivera asking an occasional question as the detectives wait for uniformed officers to transport T.D.S. to the field where he said he had thrown the gun. The recording ends when two uniformed police officers arrive.

**{¶ 7}** After searching the field where T.D.S. said he had thrown the gun—which was never recovered—the detectives took T.D.S. to the apartment building so that he could show them where the shooting had occurred. While there, T.D.S. told the detectives that he had been sitting on a crate when he accidentally shot S.G. He then described walking toward S.G. and accidently shooting him a second time.

**{¶ 8}** Next, according to Detective Reese, the detectives accompanied T.D.S. to the police station and interviewed him there. (Although a recording of that interview—exhibit No. 402—was viewed during the adjudicatory hearing and entered into evidence, the recording is not in the record that was provided to this court.) Detective Reese testified about T.D.S.'s interview. According to Detective Reese, T.D.S. told the detectives that S.G. had stolen a gun from a person named Vaughn and that Vaughn had reached out to T.D.S. and asked him to retrieve it.

**{¶ 9}** Other evidence lends credibility to T.D.S.'s assertions about Vaughn. Text messages between Vaughn and S.G. reflect Vaughn's asking S.G. about the gun. And S.G.'s cousin testified that a few days before S.G. was killed, he heard T.D.S. tell S.G. that someone had offered him $1,000 to kill S.G. but that he wasn't going to go through with it.

**{¶ 10}** T.D.S. was charged with murder, two counts of felonious assault, tampering with evidence, and having a weapon while under a disability and with an accompanying serious-youthful-offender specification. The juvenile court determined that T.D.S. was amenable to treatment in the juvenile system and declined to transfer his case to adult court. The court also determined, following a hearing, that T.D.S. was competent to stand trial.

**{¶ 11}** T.D.S.'s counsel filed a motion to suppress his statements to the detectives. During a hearing on the motion, the state argued that the statements made by T.D.S. before he was informed of his *Miranda* rights were admissible because he was not in custody when he made them. T.D.S.'s counsel, on the other hand, maintained that he was in custody the entire time and that he had not

knowingly, intelligently, and voluntarily waived his right against self-incrimination.

{¶ 12} Following the hearing, the juvenile court entered an order concluding that "the statements of [T.D.S.] up to the point where he was given his *Miranda* warning and advisement of rights are suppressed."

{¶ 13} The case proceeded to an adjudicatory trial. Before testimony began, the assistant prosecuting attorneys confirmed with the juvenile court that they could use T.D.S.'s statements that were made after he was informed of his *Miranda* rights. The judge replied, "I was not presented evidence of statements made during the station interrogation as part of the Motion to Suppress, so I make no findings as to the station interrogation." When defense counsel protested that she was "asserting that any subsequent statements that he made at the police station or anywhere to the police were fruit of the poisonous tree," the juvenile court replied, "But you didn't submit or present that interview [at the suppression hearing]."

{¶ 14} After the presentation of evidence, the court adjudicated T.D.S. delinquent for felony murder, felonious assault, tampering with evidence, and having a weapon while under a disability and found him to be a serious youthful offender. The court imposed an aggregate adult prison sentence of 15 years to life, with an additional 3-year consecutive sentence for firearm specifications. Those sentences were stayed on the condition that T.D.S. successfully complete his juvenile sentence. For his juvenile disposition, T.D.S. was committed to the Ohio Department of Youth Services until age 21.

{¶ 15} T.D.S. appealed his adjudication and disposition to the Eighth District. He argued that he had been incompetent to stand trial, that his adjudication was not supported by credible evidence, that he had been denied the effective assistance of counsel because his defense counsel had not filed a motion to dismiss some charges against him, and that the juvenile court erred in denying his motion to suppress, in part because he had not voluntarily waived his *Miranda* rights. The

court of appeals affirmed his adjudication and disposition, finding none of his claims to have merit. T.D.S. appealed to this court, challenging the court of appeals' judgment but asserting arguments related only to the admission of his statements. We accepted jurisdiction over the case to consider two propositions of law:

> Proposition of Law I: When the police employ a deliberate two-step interrogation where they question first, and warn later, a child's post warning statements are presumed inadmissible.

> Proposition of Law II: Courts must assess the totality of the circumstances, including the child's age, experience, education, background, intelligence, and capacity to understand when determining whether a child knowingly, intelligently, and voluntarily waived their *Miranda* rights in a question first, warn later scenario.

*See* 167 Ohio St.3d 1518, 2022-Ohio-3214, 195 N.E.3d 139.

## II. ANALYSIS

{¶ 16} T.D.S. challenges the use of his post-*Miranda* statements during trial on two related fronts. He argues that he did not waive his *Miranda* rights knowingly, intelligently, and voluntarily. And he maintains that the statements made after the warning should have been presumed inadmissible under this court's reasoning in *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985. Neither argument has merit. The totality of the circumstances shows that his waiver was knowing, intelligent, and voluntary. And his argument regarding *Farris* fails for multiple reasons: he did not preserve the issue for our consideration, he did not provide an adequate record for us to review his claim, and he stretches our reasoning in *Farris* too far.

**A. T.D.S. waived his rights knowingly, intelligently, and voluntarily**

{¶ 17} Only T.D.S.'s statements following the *Miranda* warnings are at issue here; the prewarning statements were all suppressed. For his postwarning statements to be admissible, the state needed to prove by a preponderance of the evidence that T.D.S. waived his rights knowingly, intelligently, and voluntarily. *State v. Garrett*, 171 Ohio St.3d 139, 2022-Ohio-4218, 216 N.E.3d 569, ¶ 101.

> In construing whether a juvenile defendant's confession has been involuntarily induced, courts should consider the standard set forth in *State v. Edwards* [49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), *vacated in part on other* grounds, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978)], which looks to the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.

*In re Watson*, 47 Ohio St.3d 86, 89-90, 548 N.E.2d 210 (1989); *see also Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) ("This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights * * *"). "[A] waiver is not involuntary *unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." (Emphasis sic.) *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 35.

*1. Under the totality of the circumstances, T.D.S.'s waiver was knowing, intelligent, and voluntary*

**{¶ 18}** T.D.S. maintains that he did not knowingly, intelligently, and voluntarily waive his rights. T.D.S. claims in his brief that "[a]s the warnings were being given, [he] was crying and burying his head into his mother's chest." The video recording, however, tells a different story. T.D.S. did throw himself into his mother's arms as Detective Reese began to read the warnings, but both Detective Reese and T.D.S.'s mother told him that he needed to listen. His mother went so far as to separate him from her before the warnings were read.

**{¶ 19}** After reading the *Miranda* warnings to T.D.S., Detective Reese asked whether he understood them. T.D.S. nodded his head and continued to answer the detective's questions. T.D.S. points out that he was not given a written copy of the warnings and that he did not sign a waiver, but there is no requirement that a waiver be written. *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 68. That T.D.S. indicated that he understood his rights and that he spoke with detectives after being informed of his rights shows that he waived them. *Id.*, citing *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). Nevertheless, T.D.S. maintains that his waiver was not knowing, intelligent, and voluntary.

**{¶ 20}** In support of his argument, T.D.S. emphasizes that he has a low IQ. But Dr. Terry Pinsoneault, one of the psychologists who evaluated T.D.S.'s competency to stand trial, opined that T.D.S.'s communications skills were somewhat better than his IQ might reflect. Even T.D.S. admitted during questioning at his mother's house that his behavior in school was a cause of his academic struggles. In any event, as we have noted, "deficient intelligence is but one factor in the totality of the circumstances that must be considered in determining the voluntariness of a waiver." *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d. 616, ¶ 190.

**{¶ 21}** Courts also look to a juvenile's prior criminal experience. T.D.S. minimizes his prior contact with the juvenile system. As recognized by the court of appeals, his adjudications of delinquency for attempted arson in 2014 and theft and falsification in 2019 must be considered as part of the totality of the circumstances. 2022-Ohio-525, ¶ 5, 20. Dr. Steven Neuhaus, another psychologist who evaluated T.D.S.'s competency, stated that T.D.S. had a "good understanding" of his prior adjudications.

**{¶ 22}** Our consideration of the "length, intensity and frequency" of T.D.S.'s interrogation, *see Watson*, 47 Ohio St.3d at 90, 548 N.E.2d 210, is limited by the record we have before us. The questioning at T.D.S.'s mother's house lasted about an hour and six minutes before he was read his *Miranda* rights. The recording continued for about another half hour, but Detectives Reese and Rivera asked only a couple of follow-up questions during that time. For example, Detective Reese asked whether T.D.S. was sure that the gun was not at his house. And Detective Rivera asked how much of the story the alleged third person at the murder site knew.

**{¶ 23}** The questioning at the house leading up to the *Miranda* warnings was not intense. T.D.S.'s mother was in the room except briefly after T.D.S. indicated that he wanted to talk to detectives without his mother present. And even then, she was nearby and can be heard speaking during the questioning. T.D.S. did not seem intimidated by the detectives. He even went so far as to challenge them. For example, at one point, T.D.S. asked Detective Reese, "Which way did I go into the building and which did I come out?  * * * You tell me, you got so much evidence." Moreover, the detectives accommodated T.D.S.'s request that Detective Legg leave.

**{¶ 24}** The only other recording of T.D.S.'s statements that was included in the record shows him and the detectives walking toward and standing in the building where the shooting occurred. As T.D.S. is walking, an unidentified officer

asks him whether he needs to stop and if he is all right. While in the building, the detectives asked where the shooting happened, and T.D.S. explained how he had shot S.G. two times accidentally. The recording of that encounter is 6 minutes and 25 seconds long. The detectives' questions about how the shooting had occurred were asked in conversational tones. Again, there was no intensity to the questioning.

{¶ 25} The total length of time of the questioning, which began at his mother's house and ended at the police station, cannot be determined from the record. But the recordings that were admitted at trial and included in the record here—the questioning at the house and the visit to the scene of the shooting—add up to approximately an hour and 45 minutes. Although Detective Reese stated that the detectives and T.D.S. had spent "a few hours" in the field looking for the gun that T.D.S. had allegedly thrown, the detective later told the court that they had spent two hours in the field. And according to an assistant prosecuting attorney's statement during the trial, the recording of the interview at the police station was 37 minutes long.

{¶ 26} In short, T.D.S.'s prior experience in the juvenile system, his understanding of that system, and his communication with detectives indicate that his waiver of his *Miranda* rights was done knowingly and intelligently. Moreover, nothing about the tone or length of the questioning resulted in his will being overborne. But T.D.S. maintains that the detectives' actions amounted to coercion.

*2. T.D.S.'s statements were not coerced by the detectives*

{¶ 27} Much of T.D.S.'s argument focuses on what he maintains were "coercive tactics" used by the police detectives. Again, we are limited in what we have before us to review—the statements he made during the interview in his mother's house, which were, for the most part, suppressed by the juvenile court, and T.D.S.'s statements while at the scene of the shooting. Neither setting reveals evidence of police coercion.

**{¶ 28}** T.D.S. claims that detectives lied to him—telling him that witnesses had identified him by name, that his DNA was found on S.G., and that gunshot residue was found on his property. But T.D.S. does not direct us to these statements in the record. Rather, in the recording from his mother's house, Detective Reese can be heard asking T.D.S. whether there would be any reason his DNA would be on S.G.'s clothing and whether gunshot residue would be found on his clothes. As to the statement about gunshot residue, T.D.S.'s clothes were not seized until after he was Mirandized and after his mother had given her consent for them to be taken, so T.D.S. knew that the officers had no such evidence.

**{¶ 29}** Likewise, another of T.D.S.'s claims—that he was isolated from his mother and sister—is not borne out by the recording. Throughout the questioning in her house, T.D.S.'s mother was either in the room where he was being interviewed or nearby. And contrary to T.D.S.'s claim that he was made to sit alone while waiting for the uniformed police to take him to the field, his mother and sister are seen with him until the end of the video recording.

**{¶ 30}** There was no indication of physical abuse or threats or deprivation of food, medical treatment, or sleep. *See Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, at ¶ 35. While Detective Reese did grab T.D.S.'s arm when he started to get up from the couch, he did not grab him roughly. At that point, Detective Reese had decided to make an arrest; T.D.S. was not free to leave. Moreover, Detective Reese told T.D.S.'s mother to sit with him on the couch. And while T.D.S. was waiting for the uniformed police officers, he was drinking from a bottle of water provided by his mother. In short, nothing that occurred in his mother's house showed police coercion. The video recording taken while at the scene of the shooting is only a few minutes long. But no threats or mistreatment occurred then.

**{¶ 31}** T.D.S. made two other assertions that merit comment. First, during oral argument, his counsel suggested that T.D.S.'s mother's presence during his

questioning was not a benefit to him but was instead coercive. Besides contradicting his claim in his brief that he had been isolated from his mother, his suggestion stands in contrast to this court's statement that "[a] juvenile's access to advice from a parent * * * also plays a role in assuring that the juvenile's waiver is knowing, intelligent, and voluntary," *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 24. His mother urged him to talk to detectives if he knew something. Setting aside whether a mother's telling her son to talk to detectives if he knows something is coercive, the comments from T.D.S.'s mother do not amount to *police* coercion when determining whether a waiver of rights was voluntary. "Absent *police* conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." (Emphasis added.) *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶ 32} T.D.S. also proposes that a juvenile's race be taken into account when considering the voluntariness of his waiver. We note our deep discomfort with the suggestion that the ability to understand one's *Miranda* rights depends on one's race. Moreover, it's hard to see how such an argument could withstand an equal-protection challenge. But in any event, T.D.S. did not make this argument below, so he has forfeited it. The court of appeals correctly determined, based on the totality of the circumstances, that T.D.S. knowingly, intelligently, and voluntarily waived his *Miranda* rights.

## B. T.D.S.'s *Farris* argument

{¶ 33} T.D.S.'s claims regarding police coercion fold into his first proposition of law. He argues that this court should apply *Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, to this case and presume that the statements he made after being informed of his *Miranda* rights are inadmissible. The problem is that T.D.S. never raised this argument in either the juvenile court or in his merit brief in the court of appeals, so it is forfeited. And even if he had preserved the

argument, he overstates the holding in *Farris*. The court in *Farris* did not change the rule that uncoerced statements following a *Miranda* warning constitute an implied waiver.

*1.* State v. Farris

{¶ 34} In *Farris*, this court considered the constitutionality of admitting into evidence the statements that Stephen Farris made to a police officer during a traffic stop for speeding. The defendant first made inculpatory statements while in custody in a police cruiser before having been informed of his *Miranda* rights. *Farris* at ¶ 3. After the statements were made, a police officer immediately informed Farris of his rights and repeated the same questions that had elicited the incriminating statements from him. *Id.* at ¶ 4.

{¶ 35} This court held that the defendant's statements made before being informed of his rights should have been excluded because he was in custody at the time. *Id.* at ¶ 14. Then we turned our attention to whether a *Miranda* warning cured the problem, making his postwarning statements admissible. *Farris* at ¶ 30. We reasoned that "[t]emporally and substantively, [the officer's] questioning of Farris constituted a single interrogation," *id.*, so that "Farris's postwarning statements were not the result of an informed choice and [were] therefore inadmissible," *id.* at ¶ 36.

*2. T.D.S. waived any argument regarding* Farris

{¶ 36} T.D.S. asks this court to apply its reasoning in *Farris* and hold that his postwarning statements are presumed inadmissible. But "[a] first principle of appellate jurisdiction is that a party ordinarily may not present an argument on appeal that it failed to raise below." *State v. Wintermeyer*, 158 Ohio St.3d 513, 2019-Ohio-5156, 145 N.E.3d 278, ¶ 10. Despite T.D.S.'s argument to the contrary, he did not preserve this argument in either the juvenile court or the appellate court.

{¶ 37} In the juvenile court, T.D.S. argued in his motion to suppress that he was in custody when he gave his statements at his mother's house and that, in any

case, his statements were involuntary. He did not mention *Farris* or a presumption of inadmissibility. True, toward the end of his motion, T.D.S. asked the court to suppress "any and all purported statements obtained in contravention of his legal rights, as well as the subsequent statements and identification as the fruit of such tainted evidence." But that request was not sufficient to put forth an argument under *Farris*, especially because the cases underlying the reasoning in *Farris*— *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), and *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)—eschewed the "fruit of the poisonous tree" justification for excluding a postwarning confession following an unwarned statement. *Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, at ¶ 21-22. "[The *Elstad*] court explained that evidence can be excluded as fruit of the poisonous tree only after a constitutional violation and that a failure to give *Miranda* warnings is not equivalent to a violation of the Constitution * * *." *Farris* at ¶ 25.

{¶ 38} The motion-to-suppress hearing focused on the arguments made in T.D.S.'s motion. Again, there was no suggestion that *Farris* applied. And as the juvenile court noted at the adjudicatory trial, during the motion-to-suppress hearing, there was no mention of statements other than those that were made by T.D.S. while at his mother's house.

{¶ 39} Although T.D.S. claims in his brief to this court that he raised *Farris* in his argument to the court of appeals, the pages of his court of appeals' brief to which he cites contain no mention of the case. Instead, it appears the case was raised for the first time in his reply brief. "Appellate courts generally will not consider a new issue presented for the first time in a reply brief." *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 18. Thus, it is not surprising that the court of appeals did not address any argument regarding *Farris*.

**{¶ 40}** Moreover, because T.D.S. did not raise *Farris* in his merit brief in the court of appeals, he prevented vetting of the juvenile court's decision with respect to custody—an issue central to the *Farris* analysis. *Farris* applies when a suspect makes statements while in custody before being given *Miranda* warnings. Here, the juvenile court determined that T.D.S. was in custody when he made statements in his mother's house. But as the state points out, it could not appeal from this judgment, because it could not certify that the ruling to suppress T.D.S.'s statements had "rendered the state's proof * * * so weak in its entirety that any reasonable possibility of effective prosecution [had] been destroyed." Crim.R. 12(K)(2). So, the court of appeals considered the issue to have been forfeited by the state. 2022-Ohio-525 at ¶ 18. The only way the appellate court could have reviewed the custody determination, then, was for T.D.S. to put the pre-*Miranda* statements at issue. But he didn't. Because the issue that T.D.S. put before the court of appeals addressed only his post-*Miranda* statements, the court of appeals never decided whether the juvenile court correctly determined that T.D.S. was in custody when he was questioned by the detectives in his mother's house.

*3. The record does not support T.D.S.'s* Farris *argument*

**{¶ 41}** Even if T.D.S. had argued *Farris* in the court of appeals, the record would not have supported his argument. *Farris* discussed the factors to be considered in determining whether a *Miranda* warning given after unwarned, custodial statements are made can be effective:

> "[T]he completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first."

*Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, at ¶ 28, quoting *Seibert*, 542 U.S. at 615, 124 S.Ct. 2601, 159 L.Ed.2d 643.

{¶ 42} The factors discussed in *Farris* reveal the flaw in T.D.S.'s proposal that the case be applied here to create a presumption of inadmissibility of his postwarning statements. *Farris* should be understood as one part of the consideration of the totality of the circumstances surrounding a waiver of *Miranda* rights. *Farris* did not eliminate the general rule that "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384, 130 S.Ct. 2250, 176 L.Ed.2d 1098.

{¶ 43} In any event, because T.D.S. did not raise the application of *Farris*'s "question first, warn later" analysis during the hearing on his motion to suppress, the record is not fully developed to consider the factors laid out in *Farris*. We do not know how all the statements before and after the *Miranda* warning overlap. (What we do know is that T.D.S. gave varying versions of the shooting throughout the questioning.) And as discussed above, the timing and the setting of the post-*Miranda* statements are also not clear. Moreover, because we do not have a recording of the interview at the police station in our record, we do not know whether the detectives "treated the second round as continuous with the first," *see Seibert* at 615. Given the record and T.D.S.'s failure to preserve the issue, we are unable to further consider the applicability of *Farris* to the statements made by T.D.S.

### III. CONCLUSION

{¶ 44} The Eighth District Court of Appeals determined that T.D.S.'s statements made after he was read his *Miranda* rights were admissible because he knowingly, intelligently, and voluntarily waived his rights. We agree and affirm the judgment of the court of appeals.

Judgment affirmed.

KENNEDY, C.J., and FISCHER and DEWINE, JJ., concur.

DONNELLY, J., dissents, with an opinion.

BRUNNER, J., dissents, with an opinion joined by STEWART, J.

_____

**DONNELLY, J., dissenting.**

{¶ 45} After reviewing this case with the benefit of a complete record and briefing from the parties, I have come to believe that this appeal should be dismissed as having been improvidently accepted.

{¶ 46} The conclusions reached in both the majority opinion and Justice Brunner's dissenting opinion turn on the application of settled law to the facts of the case. And in the majority opinion, this application leads to the same result that a unanimous panel of the Eighth District Court of Appeals reached when reviewing this case. *See* 2022-Ohio-525, ¶ 18-20. Further, it appears that the more novel issue—whether this court's holding in *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, should apply here—has not been properly preserved for our review. *See* majority opinion, ¶ 36-43 And while I share the concerns expressed in Justice Brunner's dissenting opinion about some of the tactics that the police used in their interrogation of T.D.S., I do not believe that this case is a proper vehicle for addressing those concerns.

{¶ 47} At bottom, the majority's resolution of this case provides nothing new to either the bench or bar except a fact-specific assessment of the legality of the police's interrogation of T.D.S. For that reason, I respectfully dissent.

_____

**BRUNNER, J., dissenting.**

## I. INTRODUCTION

{¶ 48} In 2019, appellant, T.D.S., a 15-year-old with an IQ of 60 who was on juvenile probation but who otherwise had little previous criminal-justice

experience, became a suspect in a murder after Cleveland police detectives received information from a school administrator.[1]  When three detectives, relying primarily on this information, went to T.D.S.'s home, his mother let them in and ordered T.D.S. to tell the detectives the truth.  Before administering *Miranda* warnings to T.D.S., *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at least one of the detectives repeatedly lied and told T.D.S. that they had evidence of his guilt, repeatedly insisted that they knew he was guilty, repeatedly threatened him with life in prison, and rejected each of T.D.S.'s denials of involvement.  The record shows that the detectives used psychological tactics to manipulate the low-IQ 15-year-old to get him to admit to the crimes—suggesting that the death of the victim might have been an accident and falsely promising numerous times that they would help him.  For the first hour of questioning, T.D.S. denied that he had been involved in the murder, but he eventually confessed that he had accidentally shot the victim, and he agreed to show the detectives where he had disposed of the gun.

**{¶ 49}** Only after T.D.S. made this confession did one of the detectives verbally give him *Miranda* warnings, and the warnings were given only after the detective made the following statement: "Listen, I gotta read you your rights, OK.

---

1. The detective testified at trial as follows:

> "Q: Okay. And what was your first order of business if you recall when you were assigned to that case?
> A [detective]: We always do in completing our original investigation, start digging into, you know, the information relating to the initial call, looking at 9-1-1 calls, radio dispatch tapes and logs, but we had received some information from a high school principal that caused us to follow up immediately on what he had told us.
> Q: And did you go speak with that individual?
> A: Yes.
> Q: And after speaking with him, had you developed a suspect?
> A: Yes.
> Q: And who was that?
> A: [T.D.S.].

But we're still gonna talk. *We ain't done*." (Emphasis added.) At no point did any detective give T.D.S. any written warnings. And T.D.S. never expressed that he waived his rights, either orally or in writing. Following the recitation of the *Miranda* warnings, the detective asked again to be shown where the gun had been discarded—a gun that police did not find when they went to the empty field that T.D.S. had identified, even though they excavated portions of the field with heavy equipment. No further *Miranda* warnings were ever administered, and law-enforcement personnel did not obtain an oral or written waiver of rights at any other point in the interrogations. During the post-*Miranda* interrogations, the detectives obtained additional confessions at two different locations from T.D.S. following his initial confession made before the *Miranda* warnings were given.

{¶ 50} The juvenile court suppressed T.D.S.'s pre-*Miranda*-warnings confession after determining that the interview of T.D.S. at his home had turned into a custodial interrogation before T.D.S. made that confession. The court rejected the detective's argument that T.D.S. could not have been in custody at the time of his first confession because there was no probable cause to arrest him until he initially confessed. Even though the basis for initially questioning T.D.S. was information from the school administrator, and even though the substance and process of giving the *Miranda* warnings was substandard (never in writing) and inadequate (having been given after the preamble: "Listen, I gotta read you your rights, OK. But we're still gonna talk. *We ain't done*." [Emphasis added.]), the juvenile court did not suppress T.D.S.'s post-*Miranda*-warnings confessions, which ended up being the key—and nearly the only—evidence used to adjudicate T.D.S. delinquent for felony murder and other offenses. I disagree with the majority opinion's determination that the post-*Miranda* confessions were properly admitted. It is unfair for the majority opinion to gloss over the manner in which the detectives obtained all the confessions made and instead focus on the manner in which T.D.S.'s counsel challenged his post-*Miranda* confessions in the juvenile court and

18

in the court of appeals. Concluding that the objections raised by T.D.S.'s counsel did not specifically address the detectives' question-first-warn-later approach to *Miranda* and that T.D.S. had therefore forfeited that objection is a stretch, based on this record.

{¶ 51} This case involves a mix of circumstances that when considered without a strong focus on the constitutionally mandated right to a fair trial, will harm the future application of the law, especially for juveniles accused of adult crimes. The circumstances here are troubling: a murder—someone's life had been violently taken; the suspect, T.D.S., was a 15-year-old who was on juvenile probation and has a low IQ of 60; T.D.S.'s mother permitted three detectives to enter her home and ask questions of her son when, unbeknownst to her, they were proceeding largely on information received from a school administrator about T.D.S.; T.D.S.'s mother sternly instructed T.D.S. to tell the truth when speaking to the detectives; T.D.S.'s mother left him alone with the three detectives for a significant period of time, and during that time, the interview became custodial;[2] the detective leading the questioning used psychological pressure and other coercive tactics of interrogation on T.D.S; the detectives failed to provide *Miranda* warnings before the interrogation began and a confession was obtained, and when

---

2. The juvenile court determined that the questioning became a *custodial* interrogation after TDS's mother left the room. It noted:

> At that point in the videoed interview [after TDS's mother left the room], the Court noted that the child's body language or response began to change; that one of the three detectives in the home moved to the couch where the child was seated, as the interviewing detective remained on the child's other side on an adjacent couch. The Court cannot conclude that the child knew or had reasonable cause to believe that he could terminate the interview or leave. The interview was conducted in his home, and his mother did not challenge the stages of the interview as its focus moved from interview to interrogation for a confession or adverse statements made by the child. His attempt to move was curtailed as he was encouraged to return to the couch and continue the interview. Subjectively, he did not present as being able to leave. The Court finds that the child at this point was detained in the custody of the officers in his home.

the warnings were verbally administered, after at least an hour of questioning, the detective qualified the warnings by saying, "We ain't done [talking]"; the record contains neither verbal nor written indication from T.D.S. that he consented to proceeding without an attorney or that he wished to keep speaking to the detectives rather than remain silent; and the detectives made threats of life imprisonment to the 15-year-old T.D.S., whom they outnumbered three to one, to keep him talking.

{¶ 52} Again, these circumstances are troubling, and unfortunately, the majority did not resist the temptation to find that this type of interrogation process resulting in a confession was acceptable under the law and in accord with the United States Constitution. After all, T.D.S. had confessed, hadn't he?

{¶ 53} But it's not that simple. And that's not what we need to determine here. The appropriate question is: Were T.D.S.'s rights adequately protected? The Eighth District Court of Appeals and a majority of this court say yes. I respectfully disagree.

{¶ 54} The facts in this case do not support the Eighth District's or the majority's conclusions. There has not been enough scrutiny in the majority opinion of the weaknesses of the *Miranda* process employed by law-enforcement personnel in this case. That defense counsel sought to have T.D.S.'s confessions suppressed but perhaps did not use specific legal terminology in doing so is not a basis for ignoring the truth that the *Miranda* process did not pass constitutional muster and that T.D.S. did not waive his rights. T.D.S.'s pre-*Miranda*-warnings confession should have been, and was rightly, suppressed. But his post-*Miranda*-warnings confessions also should have been suppressed. Thus, I respectfully dissent. I would reverse the Eighth District's judgment and remand T.D.S.'s case to the juvenile court for further proceedings, with instructions that T.D.S.'s confessions and any evidentiary fruit of them are constitutionally infirm and cannot be used to adjudicate him delinquent for committing the offenses with which he is charged.

## II. FACTS AND PROCEDURAL HISTORY

{¶ 55} On September 4, 2019, 15-year-old T.D.S. was arraigned in the juvenile division of the Cuyahoga County Court of Common Pleas on a complaint charging him with murder with firearm specifications, felony murder with firearm specifications, two counts of felonious assault with firearm specifications, tampering with evidence, and having weapons while under a disability. In accordance with R.C. 2152.13, he was subsequently indicted for felony murder with firearm and serious-youthful-offender ("SYO") specifications, two counts of felonious assault with firearm and SYO specifications, tampering with evidence, and having weapons while under a disability. The juvenile court found that T.D.S. was amenable to rehabilitation in the juvenile system and declined to bind him over to adult court. During the amenability hearing and again during a competency hearing, the juvenile court heard testimony that T.D.S.'s "full-scale IQ" was 60.

{¶ 56} As the case proceeded in juvenile court, T.D.S. filed a motion to suppress the statements he had made to the police, arguing in part that he had not been given the warnings required by *Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and that, therefore, his statements were inadmissible. The motion also requested the suppression of "subsequent statements and identification as the fruit of such tainted evidence." During a hearing on the motion, a Cleveland police detective testified that he and two other detectives had gone to T.D.S.'s house to question him. They were admitted to the house by T.D.S.'s mother. The detectives did not tell her why they wanted to speak to her son and did not offer her time to discuss the matter with him first. The three detectives then questioned T.D.S. without first reading him the warnings required by *Miranda*. During the hearing, the detective took the position that T.D.S. was not in custody during that round of questioning, that at that time he and his colleagues did not have evidence sufficient for probable cause to arrest T.D.S., and that the questioning was not a custodial interrogation. Nevertheless, the detective admitted lying to T.D.S. in an attempt to

provoke an emotional response from him, telling T.D.S. that he would spend the rest of his life in prison if he did not tell the detectives what happened, and attempting to sway him to admit that he had shot the victim by accident as a way to get T.D.S. to admit guilt. While the audio portion of video of the interrogation is faint, it is clear enough to be able to discern that the detective's testimony about his questioning of T.D.S. considerably understates the deceptive and adversarial nature of the interrogation.

**{¶ 57}** The video of the interrogation reflects that the detectives questioning T.D.S. repeatedly indicated to him that they already had strong evidence of his guilt in the form of witnesses, video of T.D.S. at or near the crime scene, gunshot residue, and DNA on the victim and at the murder scene. These assertions were untrue; as admitted by the detective in his testimony at trial, the detectives went to T.D.S.'s house to question him, primarily going on information from a school administrator about T.D.S. The detectives repeatedly and falsely indicated to T.D.S. that they knew that he had caused the death of the victim and that they were just trying to figure out if the killing was a murder or an accident. They repeatedly threatened him with adult penalties, including life in prison. Contrary to the detective's testimony at the suppression hearing that he lacked probable cause when he arrived at T.D.S.'s home to question him, he repeatedly told T.D.S. that he and the other detectives already had sufficient evidence to arrest and even to convict T.D.S. The detective rejected every attempt by T.D.S. to deny his involvement in the victim's death. At one point, he touched T.D.S. on the chest, felt his heart, and indicated to the low-IQ 15-year-old that his fast pulse showed that he was lying. The detective asserted that negative assumptions would be drawn from T.D.S.'s silence, and he even made sniffing gestures before saying, "Smell that? Smells like some bullshit." The detective also switched tactics throughout the questioning, repeatedly and falsely telling T.D.S. that he was there to help him and that T.D.S. had only this

one opportunity to help himself by telling the truth—even indicating that his mother would no longer support him if he did not tell the truth.

{¶ 58} After an hour of denying involvement and then changing his statements to conform to the evidence that the police claimed to have, T.D.S. admitted that he had accidentally shot the victim while playing with a gun. Just after he confessed, he asked to see his mother, and when she subsequently came into the room, he fell into her arms, sobbing.[3] He then agreed to show the police where he had disposed of the gun. He denied that he had had any intention to hurt the victim. His mother was not present for his actual confession, having left him alone in the room with the three detectives approximately 36 minutes after the questioning began. However, even when T.D.S.'s mother was present, she exhorted T.D.S. to tell the police the truth. Only after T.D.S's first confession did the detective leading the questioning finally administer the required *Miranda* warnings, but he prefaced them with the following statement: "Listen, I gotta read you your rights, OK. But we're still gonna talk. We ain't done." The detective then followed up the warnings by asking again to be shown where the gun had been discarded, telling T.D.S. that it was "in the spirit of [his] continu[ing] cooperation." The detective did not provide written warnings or ask for or obtain from T.D.S. any oral or written waiver of his constitutional rights.

{¶ 59} After this interview, T.D.S. was transported to the field where he had supposedly discarded the gun, but a two-hour search involving a K-9 unit and a backhoe failed to uncover the weapon. T.D.S. was also taken to the crime scene, where he gave an additional confession of how he had accidentally shot the victim. He then provided a further confession at the police station. It is undisputed that the

---

3. Immediately after making his pre-*Miranda*-warnings confession, T.D.S. asked if he could talk to his mother. He was told that he could, but when he started to stand up to go to her, a detective prevented him from leaving the room. At that point, his mother reentered the room and sat with him.

only *Miranda* warnings given were those given by the detective after an hour of questioning T.D.S. at his home and after he already confessed in response to questioning that had been initiated primarily because of information received from a school administrator.

{¶ 60} The juvenile court suppressed "the statements of the child up to the point where he was given his *Miranda* warning and advisement of rights." The juvenile court, having heard the testimony at the suppression hearing, held that the interview at T.D.S.'s home was "an interrogation, complete with police interviewing techniques, emotional pleas, superficial promises, and finally, a characterization of the possible consequences of his failure to tell them the truth [being] life in prison." The juvenile court adjudged, based on the evidence it considered at the suppression hearing, that T.D.S. did not know or have "reasonable cause to believe that he could terminate the interview or leave." The juvenile court noted that the interrogation took place in T.D.S.'s home, that his mother had not challenged the accusatory nature of it, and that on video, T.D.S. "did not present as being able to leave," and thus found that T.D.S. had been "detained in the custody of the officers in his home."

{¶ 61} The juvenile court's ruling did not plainly or separately address the suppression of the post-*Miranda* statements. However, at the outset of trial, the juvenile court made clear that despite the defense's broad suppression request, only the pre-*Miranda* statements were suppressed and that all other statements and evidence were unaffected by the suppression ruling. During the trial, when the prosecutor sought to introduce T.D.S.'s post-*Miranda*-warnings statements, defense counsel objected and again explained that that evidence was contaminated by the pre-*Miranda* confession and that any waiver of *Miranda* rights that the state argues T.D.S. made was invalid. However, the juvenile court declined to change its ruling.

**{¶ 62}** Ultimately, no witnesses to the shooting or physical evidence connecting T.D.S. with the offenses was produced at trial and the evidence used to prove his delinquency was primarily T.D.S.'s post-*Miranda* confessions, which were played and testified to at trial. The juvenile court found T.D.S. delinquent for having committed all five counts charged, based almost entirely on his confessions. The juvenile court then committed T.D.S. to the legal custody of the Ohio Department of Youth Services until his 21st birthday and also imposed an SYO sentence of 18 years to life, which it stayed on the condition that T.D.S. successfully complete the juvenile portion of his sentence.

**{¶ 63}** On appeal, the Eighth District affirmed the juvenile court's judgment. 2022-Ohio-525. One of the issues challenged on appeal was whether the juvenile court erred in refusing to suppress the post-*Miranda* statements. *Id.* at ¶ 18-19. In its decision, the appellate court did not apply the existing question-first-warn-later caselaw in analyzing the juvenile court's failure to suppress T.D.S.'s post-*Miranda* confessions. Instead, the appellate court examined whether, notwithstanding the *Miranda* warnings, T.D.S.'s will was overborne by the police interrogation. *Id.* at ¶ 19-20. It distinguished his case from others and found that T.D.S.'s post-*Miranda* confessions had been properly admitted. *Id.* The Eighth District also found that the detectives' questioning had not been coercive, even though it simultaneously recognized that the use of deceit and psychological techniques and the exertion of improper influences or direct or implied promises are coercive law-enforcement tactics under the law. *Id.* at ¶ 20.

### III. ANALYSIS

**{¶ 64}** Caselaw instructs that when reviewing a decision on a motion to suppress, the reviewing court must afford deference to the trial court's factual determinations, but it must not afford deference to the trial court's legal determinations (questions of law call for the application of the law to the facts de novo). *See, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134

L.Ed.2d 911 (1996); *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 50; *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

{¶ 65} Generally speaking, regarding the rights of a suspect during an interrogation, this court has stated:

> The Fifth and Fourteenth Amendments require that a person be notified of his or her right to remain silent and the right to the presence of an attorney *prior to* a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "Where a suspect speaks freely to police *after* acknowledging that he understands his rights, a court may infer that the suspect implicitly waived his rights." (Emphasis sic.) *State v. Murphy*, 91 Ohio St.3d 516, 519, 747 N.E.2d 765 (2001). "The determination of whether there has been an intelligent waiver of [the] right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

(Emphasis added and brackets sic.) *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 35. Due process also protects juveniles, and *Miranda* warnings must be given to juveniles. *Application of Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

{¶ 66} The requirement that a suspect be given *Miranda* warnings is triggered when the suspect is "in custody." *J.D.B. v. North Carolina*, 564 U.S. 261, 269-270, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). Determining whether a person was "in custody" during an interrogation involves determining whether under the

circumstances of the interrogation a " 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' " (Brackets sic.) *Howes v. Fields*, 565 U.S. 499, 509, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012), quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The United States Supreme Court has also recognized that when determining whether a juvenile was in custody during an interrogation, his or her age is an important consideration because "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." *J.D.B.* at 272.

{¶ 67} In T.D.S.'s case, he was 15 years old, was already on juvenile probation, and was confronted in his home by three detectives who were much larger than he was and who informed him from the beginning and repeatedly thereafter that he "need[ed]" to talk to them and was required to tell the truth. His mother was present for part of the interrogation,[4] but she instructed her son against the exercise of his unwarned rights to remain silent and to speak to an attorney, ordering T.D.S. to talk to the police and tell them what he knew. It is abundantly clear that a reasonable person of T.D.S.'s age would not have felt free to terminate the interrogation and leave, and as the juvenile court concluded, T.D.S.'s confession occurred while his constitutional rights were being violated. The juvenile court stated that it could not conclude that "the child knew or had reasonable cause to believe that he could terminate the interview or leave" and that despite the detective's statement that T.D.S was a smart kid, "this acknowledgement did not translate to his ability to know or act upon 'his rights' at or during the interview." *See Haley v. Ohio*, 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (plurality opinion) ("[W]hen, as here, a mere child—an easy

---

4. The court of appeals stated, contrary to video footage that shows otherwise, that "T.D.S.'s mother was present during the entire interview," 2022-Ohio-525, ¶ 20.

victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens"). Thus, *Miranda* warnings were required.

**{¶ 68}** And not only were *Miranda* warnings required: the timing of the warnings mattered. Warnings given after a confession are ineffective. Both this court and the United States Supreme Court have explicitly denounced the question-first-warn-later tactic that was used in this case. *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 19-36; *Missouri v. Seibert*, 542 U.S. 600, 617, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion) and *id.* at 618 (Kennedy, J., concurring in judgment only). In *Seibert*, four justices of the United States Supreme Court joined an opinion that states:

> [T]he reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without

28

expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail.

(Footnote omitted.) *Id.* at 613 (plurality opinion). Moreover, this court has held that the Ohio Constitution provides more protection than the United States Constitution in these situations—all evidence recovered as fruit of unwarned confessions is to be excluded in Ohio:

[E]vidence obtained as the direct result of statements made in custody without the benefit of a *Miranda* warning should be excluded. We believe that to hold otherwise would encourage law-enforcement officers to withhold *Miranda* warnings and would thus weaken Section 10, Article I of the Ohio Constitution. In cases like this one, where possession is the basis for the crime and physical evidence is the keystone of the case, warning suspects of their rights can hinder the gathering of evidence. When physical evidence is central to a conviction and testimonial evidence is not, there can arise a virtual incentive to flout *Miranda*. We believe that the overall administration of justice in Ohio requires a law-enforcement environment in which evidence is gathered in conjunction with *Miranda*, not in defiance of it. We thus join the other states that have already determined after *Patane*[5] that their state constitutions' protections against self-incrimination extend to physical evidence seized as a result of pre-*Miranda* statements. *State v. Knapp* (2005),

___

5. We noted in *Farris* that in *United States v. Patane*, 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004), the United States Supreme Court concluded that "the *Miranda* rule protects against violations of the Fifth Amendment's Self-Incrimination Clause, but does not apply to nontestimonial physical evidence." *Farris* at ¶ 37.

2005 WI 127, 285 Wis.2d 86, 700 N.W.2d 899; *Commonwealth v. Martin* (2005), 444 Mass. 213, 827 N.E.2d 198. Thus, the physical evidence obtained as a result of the unwarned statements made by Farris in this case is inadmissible pursuant to Section 10, Article I of the Ohio Constitution.

*Farris* at ¶ 49.

**{¶ 69}** In this case, a psychologically coercive custodial interrogation took place for more than an hour before the *Miranda* warnings were administered. The detectives questioning T.D.S., a 15-year-old with an IQ of 60 and little previous criminal-justice experience, repeatedly lied and told T.D.S. about evidence they had of his guilt, repeatedly insisted that they knew he was guilty, repeatedly threatened him with life in prison, rejected every attempt by T.D.S. to deny involvement, intentionally manipulated his emotions, suggested that the victim's death may have been accidental as a ploy to obtain a confession, and repeatedly and falsely promised to help him. After T.D.S.'s repeated denial of involvement, he finally confessed to accidentally shooting the victim and agreed to show the police where he had disposed of the gun. And only after this confession did a detective give the *Miranda* warnings, but he prefaced the warnings with the statement, in contradiction of the rights to silence and to an attorney, "Listen, I gotta read you your rights, OK. But we're still gonna talk. We ain't done." He then followed up the warnings by asking again to be shown where the gun had been discarded, "in the spirit of [T.D.S.'s] continu[ing] cooperation." He did not provide written warnings or ask for or obtain any sort of waiver, oral or written. The detectives then obtained repeated confessions at two different locations without administering any further *Miranda* warnings.

**{¶ 70}** Because, as Justice Kennedy stated in his opinion in *Seibert*, "*Miranda*'s clarity is one of its strengths," *Seibert* at 622 (Kennedy, J., concurring

in judgment only), and because (1) only one set of *Miranda* warnings was administered, (2) the warnings were given after T.D.S. confessed, (3) the warnings were given only verbally, not in writing, and (4) there is no evidence that the 15-year-old T.D.S. waived his *Miranda* rights, both *Seibert* and *Farris* support suppressing T.D.S.'s post-*Miranda* statements. The concurring opinion in *Seibert* applied a narrower test than the plurality opinion—one that is applicable "only in the infrequent case * * * in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Seibert* at 622 (Kennedy, J., concurring in judgment only). Based on the evidence and the admonishment from the detective questioning T.D.S.—"Listen, I gotta read you your rights, OK. But we're still gonna talk. We ain't done"—I would find the detective's technique, even under the narrower test used by Justice Kennedy (whose concurrence in the judgment in *Seibert* provided the crucial fifth vote), violative of *Miranda*.

{¶ 71} The majority opinion posits that T.D.S. "did not preserve the issue for our consideration, he did not provide an adequate record for us to review his claim, and he stretches our reasoning in *Farris* too far." Majority opinion, ¶ 16. The majority opinion states that "T.D.S. never raised [the question-first-warn-later] argument in either the juvenile court or in his merit brief in the court of appeals, so it is forfeited." *Id.* at ¶ 33. I do not agree with these conclusions.

{¶ 72} T.D.S. filed a motion to suppress the statements that he made to the police on the grounds that he had not been read the *Miranda* warnings and his statements were not voluntary. The motion also requested the suppression of "subsequent statements and identification as the fruit of such tainted evidence." The juvenile court granted that motion "in pertinent part." Then, at the outset of trial, the juvenile court made clear that despite defense counsel's broad suppression request, the suppression ruling applied only to the pre-*Miranda* statements and that all other statements and evidence were unaffected by the ruling. Defense counsel objected, stating:

Your Honor, I did in my Motion to Suppress, at the end of my motion I do ask that the Court suppress any and all purported statements obtained in contravention of the legal rights as well as the subsequent statements and identification as the fruit of such tainted evidence.

So I am asserting that any subsequent statements that he made at the police station or anywhere to the police were fruit of the poisonous tree.

Moreover, when the prosecutor sought to introduce the post-*Miranda* statements made by T.D.S., T.D.S.'s counsel objected and again explained that T.D.S's post-*Miranda* statements were contaminated by the pre-*Miranda* confession and that any waiver of *Miranda* rights that T.D.S. may have made was invalid.

**{¶ 73}** Contrary to the majority's assertion, T.D.S. also raised these issues on appeal. For example, in his brief to the Eighth District, he noted that the juvenile court had suppressed the pre-*Miranda* statements, but he argued that it should also have suppressed the post-*Miranda* statements:

T.D.S. was interviewed in four different locations on September 3, 2019. First, he was interviewed in his home. After he was interviewed for over an hour, he was Mirandized, then arrested and taken to a field on Corlett Avenue where he was questioned. Then, he was interviewed at the crime scene—an abandoned house on Gay Street. Finally, still under arrest, he was taken to the police station and interrogated.

T.D.S. was in custody for all of these interviews—the juvenile court found as much during its analysis of the motion to

suppress. And, the juvenile court suppressed all the statements that T.D.S. made to the police before the *Miranda* warnings were given, finding them to be the product of police coercion. But, the court did not undergo any analysis on whether the statements T.D.S. made after the *Miranda* warnings were voluntary. When T.D.S. received his one and only *Miranda* warnings about an hour into a 6-hour long interview, the slate was not wiped clean. The vulnerabilities that existed within T.D.S. still existed after Detective Aaron Reese recited the warnings, without catering to T.D.S.'s abilities or checking for understanding. And, rather than "curing" the interview of its coerciveness, the warnings served as another tool in a wide array of psychological tactics that the police used against T.D.S. that day.

(Record citations omitted.) Later in the same section of his appellate brief, T.D.S. argued: "The *Miranda* warnings were not given again before T.D.S. was asked to give another statement." And this argument was made within the context of a discussion concerning the juvenile court's suppression of T.D.S.'s pre-*Miranda* statements—leaving the post-*Miranda* statements as the only statements that T.D.S. could have been challenging on appeal.

{¶ 74} And T.D.S.'s reply brief before the Eighth District leaves no doubt:

T.D.S. argues that the juvenile court got it right in suppressing his statements pre-*Miranda*. And, [the] essence of this assignment [of error] is that the suppression should have extended to the post-*Miranda* statements because the factors the juvenile court relied on in granting the motion continued to exist—and even got worse—after the warnings were given. These factors prevented

T.D.S. from validly waiving his rights. Further, the suppression of the post-*Miranda* statements is required under the Ohio Supreme Court's decision in *State v. Farris*. *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 17-20. The essential facts were almost identical to the situation here: Mr. Farris was interrogated by the police with no *Miranda* warnings when he gave incriminating statements, then *Miranda* warnings were given and Mr. Farris gave the exact same statements again. *Id*. at ¶ 1-5. The court reasoned:

"The overarching concern when considering the sufficiency of a *Miranda* warning is whether it is given in a manner that effectuates its purpose of reasonably informing a defendant of his rights. The words themselves are not magical and are not curative of interrogation mistakes that occur before it is given:

" 'Just as "no talismanic incantation [is] required to satisfy [*Miranda*'s] strictures," *California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (per curiam), it would be absurd to think that the mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance. "The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.' " *Duckworth v. Eagan*, 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (quoting *California v. Prysock*, 453 U.S. 355, 361, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981)).' *Missouri v. Seibert*, 542 U.S. 600, 611, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

"In a question-first scenario in which the *Miranda* warning is withheld and the suspect makes inculpatory statements, the risk is that the warning will mean less when it is eventually recited:

" 'The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.' *Seibert*, 542 U.S. at 611-612, 124 S.Ct. 2601, 159 L.Ed.2d 643." [*Farris*] at ¶ 17-20.

Here, the warnings did not function effectively. The one and only recitation of T.D.S.'s *Miranda* warnings were just a few seconds out of a continuous interview that was more than six hours long. The warnings were delivered by a police officer who had just threatened T.D.S. with life in prison. They were given to a 15-year-old who had documented intellectual deficits. They were quietly and rotely recited to a child who was actively sobbing into his [mother's] arms, who was not looking at the person delivering them or nodding along in acknowledgement or understanding. The officer did not tell T.D.S. that he could stop talking, even though he had previously talked. Then, contrary to the state's assertion, T.D.S. did not "agree to accompany" the police to the field, *he was arrested and taken there in handcuffs*. As such, this Court must find that the juvenile court erred in denying the motion to suppress in part.

(Emphasis sic; second and third set of brackets added in *Seibert*; fourth and fifth set of brackets added in *Duckworth*.)

**{¶ 75}** Even if T.D.S. was not as artful as the majority would have liked him to be in preserving the question-first-warn-later issue, a fair review of the record tells the truth of the matter—he did not forfeit the issue in either the juvenile court or the court of appeals. And because the juvenile court suppressed the pre-*Miranda* statements, the only statements T.D.S. could have been challenging in the juvenile court and on appeal were his post-*Miranda* statements. Based on both federal and state caselaw, the question-first-warn-later issue is dispositive and cannot be ignored or discarded.

**{¶ 76}** Even the state recognizes that the substance of the question-first-warn-later issue needs to be addressed in this case. It asserts in its brief to this court that the United States Supreme Court's caselaw on this point is not clear. In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the court declined to suppress a post-*Miranda* confession that followed a prewarning admission. But the facts in *Elstad* are notably different from those in *Seibert*, *Farris*, and the case at bar. In *Farris*, we described *Elstad*'s facts as follows:

> In *Elstad*, police officers went to the home of the 18-year-old defendant with a warrant for his arrest. While one officer went to the kitchen to explain to the suspect's mother that her son was being arrested for the burglary of a neighbor's residence, another officer stayed with Elstad in the living room and had a brief discussion with him. The officer explained that the neighbor's house had been robbed and that he thought Elstad was involved. Elstad stated to the officer, "Yes, I was there." *Elstad*, 470 U.S. at 301, 105 S.Ct. 1285, 84 L.Ed.2d 222.

> The officers then transported Elstad to the sheriff's department, and about one hour later, interviewed him in the office of one of the officers. One officer advised Elstad for the first time of his *Miranda* rights, reading from a standard card, without mentioning Elstad's previous statement. Elstad waived his rights and then made a full, detailed statement, explaining that he had known that the neighbors would be out of town and that he had been paid to help several people gain entry through a defective sliding glass door.

*Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, at ¶ 23-24. The full extent of the pre-*Miranda* interaction at issue in *Elstad* was described by the officer as follows:

> "I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, 'Yes, I was there.' "

*Elstad* at 301. The pre-*Miranda* conversation at issue in *Elstad* was brief, and Elstad's confession was essentially spontaneous. In contrast, for T.D.S., the pre-*Miranda* confession occurred after an hour-plus-long psychologically coercive interrogation that reduced the accused child to a sobbing heap. Clearly, the cases are factually distinguishable from each other.

**{¶ 77}** Even when *Miranda* warnings are not required or are validly waived, a confession is not admissible unless it is voluntary. *Dickerson v. United States*, 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The burden of establishing the voluntariness of a confession is on the state, *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 25, and in the case of a juvenile, " 'the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair,' " *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 41, quoting *Gault*, 387 U.S. at 55, 87 S.Ct. 1428, 18 L.Ed.2d 527. Regarding juvenile confessions, we have explained:

> In deciding whether a juvenile's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; and the existence of physical deprivation or inducement.

*In re Watson*, 47 Ohio St.3d 86, 548 N.E.2d 210 (1989), paragraph one of the syllabus. Several appellate courts, including the Eighth District in this case, have set forth which tactics by law-enforcement personnel are coercive, especially when they are used on juvenile suspects; these tactics include, but are not limited to, " ' "physical abuse, threats, deprivation of food, medical treatment or sleep, *use of certain psychological techniques, exertion of improper influences or direct or implied promises, and deceit*." ' " (Emphasis added.) 2022-Ohio-525 at ¶ 20, quoting *In re M.J.C.*, 12th Dist. Butler No. CA2014-05-124, 2015-Ohio-820, ¶ 18, quoting *In re N.J.M.*, 12th Dist. Warren No. CA2010-03-026, 2010-Ohio-5526, ¶ 20; *In re D.F.*, 2015-Ohio-2922, 38 N.E.3d 1202, ¶ 12 (10th Dist.), quoting *N.J.M.*

at ¶ 20, which cited *State v. Getsy*, 84 Ohio St.3d 180, 189, 702 N.E.2d 866 (1998). And the United States Supreme Court has stated:

> By its very nature, custodial police interrogation entails "inherently compelling pressures." *Miranda*, 384 U.S., at 467, 86 S. Ct. 1602[, 16 L.Ed.2d 694]. Even for an adult, the physical and psychological isolation of custodial interrogation can "undermine the individual's will to resist and * * * compel him to speak where he would not otherwise do so freely." *Ibid*. Indeed, the pressure of custodial interrogation is so immense that it "can induce a frighteningly high percentage of people to confess to crimes they never committed." *Corley v. United States*, 556 U.S. 303, 321, 129 S.Ct. 1558, 1570, 173 L.Ed.2d 443, 458 (2009) (citing Drizin & Leo, The Problem of False Confessions in the Post-DNA World, 82 N.C.L.Rev. 891, 906-907 (2004)); *see also Miranda*, 384 U.S., at 455, n. 23, 86 S.Ct. 1602[, 16 L.Ed.2d 694]. That risk is all the more troubling—and recent studies suggest, all the more acute—when the subject of custodial interrogation is a juvenile. See Brief for Center on Wrongful Convictions of Youth et al. as *Amici Curiae* 21-22 (collecting empirical studies that "illustrate the heightened risk of false confessions from youth").

(Ellipsis sic.) *J.D.B.*, 564 U.S. at 269, 131 S.Ct. 2394, 180 L.Ed.2d 310.

{¶ 78} Given (1) T.D.S.'s low IQ, (2) his youth, (3) the psychologically coercive nature of the interrogation, and (4) the fact that the police never found the gun where T.D.S. said that he had discarded it, the possibility that this coerced confession was also a false confession cannot be ignored. There was little evidence presented at trial to corroborate T.D.S.'s confessions. Some testimony established

that the victim's life was under threat from an adult referred to as "Vaughn" from whom the victim had allegedly stolen a gun. There was also testimony that before the homicide, T.D.S. was overheard telling the victim that "Vaughn" had offered T.D.S. $1,000 to kill the victim but T.D.S. then reassured the victim that he would not do it. Though the state suggests that that testimony shows a motive for murder, the testimony actually cuts both ways because it also is evidence that there was at least one gun-owning adult who was interested in causing the victim's death. Additionally, other testimony at trial, including from the victim's family, established that T.D.S. and the victim were friends.

## IV. CONCLUSION

{¶ 79} T.D.S. was subjected to a psychologically coercive custodial interrogation for over an hour before he yielded to pressure and confessed. The coercive tactics used by the interrogating detective included offering to help T.D.S. and suggesting that T.D.S. may have accidentally killed the victim. Only after confessing under this pressure was T.D.S. administered *Miranda* warnings, but along with the *Miranda* warnings, he was told by the detective that his rights to remain silent and to consult an attorney—the indisputable rights of *Miranda*—were not unconditional and that his assertion of those rights would not terminate the interrogation: "Listen, I gotta read you your rights, OK. But we're still gonna talk. We ain't done." T.D.S. then was led to confess twice more without receiving renewed warnings and without an understanding that his prior confession could not be used against him. These circumstances should give any court pause. T.D.S. was 15 years old. He was also a child who was psychologically and mentally vulnerable with a low IQ. Inescapably, the methods used by the detectives in this case to elicit T.D.S.'s first and subsequent confessions were unconstitutional. And the objections made by his counsel regarding both the pre-*Miranda* and post-*Miranda* statements were made with sufficient clarity and were not forfeited. T.D.S.'s confessions, the key evidence used to adjudicate him delinquent, were

unconstitutionally obtained and must be excluded under *Farris*. To suggest that this issue was not preserved is absurd in light of the record before us. The post-*Miranda* statements should have been excluded as unconstitutional fruits of the pre-*Miranda* custodial interrogation and confession. Because the majority opinion endorses an interrogation that flouts precedent, I dissent.

STEWART, J., concurs in the foregoing opinion.

———————————

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristen Hatcher, Assistant Prosecuting Attorney, for appellee.

Elizabeth R. Miller, Ohio Public Defender, and Lauren Hammersmith, Assistant Public Defender, for appellant.

———————————