**[Cite as *In re X.P.*, 2026-Ohio-1222.]**

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| IN RE: X.P. | : | CASE NO. 25CA4149 |
|     I.R. | | |
| | : | |
| Adjudicated Neglected/ | | |
|  Dependent Children. | : | DECISION & JUDGMENT ENTRY |
| | : | |

_____

APPEARANCES:

Lisa Rothwell, West Union, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and
Elisabeth M. Howard, Assistant Scioto County Prosecuting
Attorney, Portsmouth, Ohio, for appellee.

_____
CIVIL APPEAL FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED:3-25-26
ABELE, J.

{¶1} This is an appeal from a Scioto County Common Pleas
Court, Juvenile Division, judgment that granted Scioto County
Children Services, appellee herein, permanent custody of four-
year-old I.R.[1]

{¶2} Appellant, D.T., the child's biological father, assigns
the following errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT ERRED IN NOT CONDUCTING AN
> ADJUDICATORY HEARING WITHIN THE REQUIRED
> STATUTORY PERIOD, PURSUANT TO R.C.
> 2151.35(B)(1)."

---

[1] This appeal does not involve X.P., the other child listed in the case
caption.

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE CHILD, PURSUANT TO R.C. 2151.414(A)(2)."

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN FAILING TO RECORD ITS ADJUDICATION AND DISPOSITIONAL HEARINGS, PURSUANT TO JUVENILE RULE 37."

FOURTH ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING BY CLEAR AND CONVINCING EVIDENCE THAT IT WOULD BE IN THE BEST INTERESTS OF [THE] CHILD TO PERMANENTLY TERMINATE THE PARENTAL RIGHTS OF HIS PARENTS AND PLACE HIM IN THE PERMANENT CUSTODY OF SCIOTO COUNTY JOB AND FAMILY SERVICES, CHILDREN SERVICES DIVISION."

FIFTH ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT FOUND BY CLEAR AND CONVINCING EVIDENCE THAT [THE] CHILD COULD NOT BE PLACED WITH HIS FATHER WITHIN A REASONABLE TIME OR SHOULD NOT BE PLACED WITH HIS FATHER."

SIXTH ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING THAT THE SCIOTO COUNTY DEPARTMENT OF JOBS AND FAMILY SERVICES MADE REASONABLE EFFORTS TO REUNIFY [THE] FATHER WITH HIS CHILD."

SEVENTH ASSIGNMENT OF ERROR:

"THE GUARDIAN AD LITEM FAILED TO COMPETENTLY PERFORM HER DUTIES PURSUANT TO SUPERINTENDENCE RULE 48.  THUS, THE COURT ABUSED ITS DISCRETION IN TAKING HER REPORT

> INTO EVIDENCE AND ALLOWING HER TO SUBMIT
> TESTIMONY AND A BEST INTEREST
> RECOMMENDATION."
>
> EIGHTH ASSIGNMENT OF ERROR:
>
> "THE APPELLANT WAS DENIED HIS RIGHT TO
> EFFECTIVE ASSISTANCE OF COUNSEL."

{¶3} In October 2021, appellee received a referral that the child's mother had been arrested for shoplifting and admitted that she recently used "ice."  At the time of the mother's arrest, X.P. had been with the mother, and I.R. had been at home with the putative father, L.R.  When a caseworker subsequently visited the home to check on I.R., L.R. consented to a drug screen and tested positive for methamphetamine, oxycodone, benzodiazepine, and buprenorphine.

{¶4} Shortly thereafter, appellee filed a complaint that alleged I.R. to be "neglected/dependent."  Appellee requested an ex parte order to place the child in its temporary custody pending adjudication and disposition, and further requested temporary custody of the child.  The trial court subsequently granted appellee emergency, temporary custody of the child.

{¶5} On January 14, 2022, the trial court adjudicated the child "neglected/dependent," and, on January 26, 2022, the court entered a dispositional order that placed the child in appellee's temporary custody.

{¶6} A short time later, the parties learned that L.R. is not I.R.'s biological father.  The mother subsequently advised appellant that she believed that he is the child's father.  Additionally, the mother filed a motion that asked the trial court to order appellant to undergo genetic testing to determine if he is I.R.'s biological father.  On June 3, 2022, the court granted this motion.

{¶7} More than one year later, on October 6, 2023, the trial court entered a nunc pro tunc order to correct "a clerical error" in its June 3, 2022 order.  The court stated that its previous entry "failed to detail the needed participation of all parties with the Scioto County Child Support Enforcement Agency (CSEA) to complete [the genetic] testing."

{¶8} In January 2024, appellant obtained a DNA test, which later confirmed that he is I.R.'s biological father.

{¶9} On February 23, 2024, appellee filed a motion that asked the trial court to modify the disposition to permanent custody.  Appellee alleged that the child had been in its temporary custody for 12 or more months of a consecutive 22-month period and that placing the child in its permanent custody would be in his best interest.

{¶10} On July 16, 2024, the trial court held a hearing to consider appellee's permanent custody motion.  At the hearing, the family's caseworker, Timothy Secoy, testified that after the

children entered appellee's temporary custody, appellee developed a case plan that required the mother to (1) obtain an alcohol and drug assessment and follow any treatment recommendations, (2) obtain a mental health assessment and follow any treatment recommendations, (3) submit to random drug screens, and (4) complete parenting classes. The mother entered some drug treatment programs, but she did not remain drug-free.

{¶11} The evidence reveals that the mother consistently visited the child and interacted appropriately with him during the visits. Appellee later offered the mother extended visits and, eventually, unsupervised visits. During the period of unsupervised visits, the mother unfortunately relapsed. Thus, the visits returned to supervised visits at the agency.[2]

{¶12} At the time of the permanent custody hearing, the mother did not have independent housing, but instead lived with her parents. Secoy indicated that the mother's parents would not be appropriate caregivers for the child, but he did not provide the reason appellee deemed appellant's parents inappropriate. Secoy stated that he had not been able to locate the records.

{¶13} Secoy next explained appellant's involvement in the case. In June 2022, appellant contacted Secoy to state that he

---

[2] Secoy could not recall the dates when appellant had unsupervised visits with the children or when she relapsed.

believed that he is I.R.'s biological father.  The next month,
Secoy met with appellant and gave him the paperwork needed to
complete a drug screen and a background check.  Secoy also
advised appellant to complete parenting classes.  He further
informed appellant that "if he wanted to become involved in the
case that he needed to come down here to Juvenile Court, request
an attorney, as well as go get a DNA test."

{¶14} In August 2022, appellant visited the agency and
dropped off a certificate that indicated he had completed
parenting classes.  Secoy did not have any further contact with
appellant until June 27, 2023, when appellant next contacted
him.  During that approximately 11-month period, appellant did
not have any supervised visits with the child, but appellant
reported that he saw the child when the mother had unsupervised
visits.

{¶15} In July 2023, Secoy visited appellant's home to
perform a safety audit.  Secoy stated that appellant had been
remodeling the home, but the home otherwise appeared to be free
of safety hazards.  Secoy asked appellant to resolve the few
safety hazards that the remodeling posed and to obtain bedding
for the child's room.  When Secoy returned to the home,
appellant had resolved the safety issues.

{¶16} Beginning in October 2023, appellee offered appellant
supervised visits with the child that occurred during the same

time as the mother's visits.  Appellant regularly attended the visits until May 2024, when "he was in the potential jeopardy of losing his job."

{¶17} In June 2024, appellant asked about having a weekend visit with the child or scheduling a different time to visit the child.  Secoy informed appellant that appellee "would not be moving forward with expanding visitations," given that appellee had filed a permanent custody motion.

{¶18} Appellee did not seek to place the child with appellant due to appellant's approximately one-year delay in following Secoy's instructions to become involved in the case, such as obtaining a DNA test.  Secoy further stated that appellant's interaction with the child was "very hit and miss."  He explained that appellant "[s]ometimes [was] attentive" to the child, but "other times," he was "very standoffish" and did not seem to "know how to appropriately interact."  Secoy did not observe any bond between appellant and the child.

{¶19} Secoy also explained that child is doing well in his foster home.  The child has been with the same foster family since the end of October 2021, when he was about 14 months of age.  The child is bonded with his foster family and refers to the foster parents as "mom" and "dad."  The child also interacts well with the other children in the home.

{¶20} After Secoy's testimony, the court continued the hearing until January 3, 2025.

{¶21} When the hearing resumed, the child's foster mother testified that the child is doing well in her home and that she and her husband would be willing to adopt the child if the trial court were to grant appellee permanent custody.

{¶22} Margaret McCue testified that she is a behavioral health therapist and counseled the child. McCue reported that the child has "[s]evere ADHD" and "difficulty regulating his emotions." She has been helping him learn some techniques to help him better regulate his emotions.

{¶23} McCue indicated that the child interacts well with the foster family. She believes that the child thinks of "his foster parents as his parents." When she has spoken with the child about his visits with the mother, he "talks about [X.P., his half-brother] more than anything." After McCue's testimony, appellee rested.

{¶24} Appellant presented testimony from his 18-year-old daughter who stated that appellant obtained custody of her when she was around 10 or 11 years of age, and she lived with him until she completed high school. The daughter reported that appellant was a great father and provided for all of her needs.

{¶25} The daughter additionally indicated that she interacted with the child until appellee removed him from

appellant's home.  She stated that she was with the child "all the time" "until he was like one."  The daughter further asserted that, after appellee removed the child from the mother's home, she and appellant visited the child when the child visited the mother at her home.  The daughter testified that appellant helped the child with anything that he needed or wanted.  She believed that appellant could provide proper care for the child.

{¶26} Appellant testified that he and the mother were in a relationship until December 2019.  A month or two later, he heard that the mother was pregnant.  Appellant asked the mother about the pregnancy, and she "swore up and down" that the baby was not his baby.  Appellant nevertheless thought that he might be the child's father.

{¶27} In April 2022, the mother told appellant that he was the child's father.  Appellant informed the mother that he "pretty much already knew" and "was just waiting for it to come out."  Appellant explained that because he and the mother ended their relationship in December 2019, he suspected that the child, who was born in August 2020, is his child.

{¶28} In October 2023, appellant started to have supervised visits with the child.  Before then, he had visited the child when the child visited the mother's home.

{¶29} When on cross-examination appellee's counsel asked appellant why he did not more vigorously pursue custody of the child after he learned in April 2022 that he likely was the child's father, appellant explained that he thought that he needed "to go through the proper procedures" to see the child. Appellant agreed, however, that, after he first contacted Secoy in June 2022, he did not again contact Secoy to inquire about the status of the case until June 2023.

{¶30} The child's guardian ad litem (GAL) testified and recommended that the court place the child in appellee's permanent custody. She observed the child in his foster home and stated that he is "thriving."

{¶31} The GAL expressed concerns about appellant's lack of follow-through once he learned that he is the child's father. She further indicated that appellant "knew at conception that [the child] could have been his child." The GAL believed that appellant could have been "more aggressive in making things happen to see his son." The GAL thought that appellant had missed "very formative years" with the child.

{¶32} After the hearing, appellant filed a written closing statement. He asked the trial court to deny appellee's permanent custody motion due to its alleged failure to make reasonable efforts to place the child in his care. Appellant argued that appellee failed to explain why the child could not

be placed with him.

{¶33} On July 9, 2025, the trial court granted appellee permanent custody of the child. The trial court found that the child had been in appellee's temporary custody for 12 or more months of a consecutive 22-month period and that placing him in appellee's permanent custody is in his best interest. The court noted that the child had been in appellee's continuous, temporary custody for more than two years and that neither parent appeared to dispute this fact.

{¶34} Regarding the parents' involvement in the case, the trial court found that, although the mother attempted to obtain treatment for her substance abuse, she continued to test positive for methamphetamines, amphetamines, oxycodone, buprenorphine, and THC. The court additionally noted that the mother failed to maintain suitable housing or stable employment.

{¶35} The trial court observed that, in June 2022, appellant contacted appellee to ask about becoming involved in the case. At that time, the caseworker spoke with appellant and gave him instructions so that appellee could add him as a party to the case. The caseworker did not, however, hear from appellant until about one year later, on June 27, 2023. Shortly thereafter, the caseworker visited appellant's home for a safety audit. The audit indicated that some minor repairs needed to be made. After appellant made the repairs, appellee started the

process to begin visits.

{¶36} The trial court determined that appellant "was aware of this case and the needs of [the child]. He just ignored them until permanent custody became an issue." The court stated that appellant "knew there was a possibility that I.R. was his biological son because [he] had contact with [the mother] and the minor child informally before I.R. was removed."

{¶37} With respect to the child's interaction and interrelationship with others, the trial court noted that the caseworker testified that the child had not developed a bond with appellant. The court further observed that (1) on October 23, 2023, appellant had his first visit with the child, (2) over the next year, appellant's visits with the child "were sporadic," and (3) as of July 16, 2024, appellant had attended about eight visits with the child.

{¶38} The trial court next considered the child's interaction and interrelationship with the foster family. The court pointed out that the child's foster mother stated that the child has been placed in her home since the end of October 2021. The court found that the child "has flourished" while in the foster home and "has a strong bond with her husband and her mother." The court also indicated that the foster mother "shares a strong and loving bond with the minor child." The court additionally recognized that I.R.'s therapist likewise

testified that he had a strong bond with the foster parents.

{¶39} The trial court next considered the child's wishes. The court noted that the child's GAL recommended that the court place the child in appellee's permanent custody.

{¶40} The trial court next reviewed the child's custodial history and observed that the child has been in appellee's temporary custody for 12 or more months of a consecutive 22-month period.

{¶41} The trial court further determined that the child needs a legally secure permanent placement and that he cannot achieve this type of placement without granting appellee permanent custody. The court found the following facts supported its conclusion: (1) the mother failed to complete substance abuse treatment and failed to maintain sobriety; (2) appellant "has failed to build a meaningful bond with his son"; and (3) the child has "stabilized" while living with the foster family.

{¶42} The trial court concluded that continuing the child "in a state of uncertainty is contrary to [his] best interest[]." The court emphasized that the child had been in foster care for an "extensive length of time" and has developed "evident bond[s] with [his] foster famil[y]." The court thus determined that placing the child in appellee's permanent custody would serve his best interest and granted appellee

permanent custody of the child.  This appeal followed.

I

{¶43} In his first assignment of error, appellant asserts that the trial court erred by failing to conduct an adjudicatory hearing within 30 days after the date on which appellee filed the complaint.[3]

{¶44} R.C. 2151.28 contains the time guidelines for adjudicatory hearings.  The statute provides as follows:

> (A) No later than seventy-two hours after the complaint is filed, the court shall fix a time for an adjudicatory hearing.  The court shall conduct the adjudicatory hearing within one of the following periods of time:
> . . . .
> (2) If the complaint alleged that the child is an abused, neglected, or dependent child, the adjudicatory hearing shall be held no later than thirty days after the complaint is filed, except that, for good cause shown, the court may continue the adjudicatory hearing for either of the following periods of time:
> (a) For ten days beyond the thirty-day deadline to allow any party to obtain counsel;
> (b) For a reasonable period of time beyond the thirty-day deadline to obtain service on all parties or any necessary evaluation, except that the adjudicatory hearing shall not be held later than sixty days after the date on which the complaint was filed.

{¶45} We initially observe that, during the trial court proceedings, appellant did not object to the trial court's alleged failure to comply with the time period set forth in R.C. 2151.28(A).  "Ohio courts have routinely held that a party may

---

[3] We observe that appellant's brief does not comply with App.R. 19(A), which requires briefs to use "double spacing between each line of text except quoted matter which shall be single spaced."

implicitly or expressly waive the right to an adjudication hearing within the time period stated in R.C. 2151.28(A)(2) . . . .” *In re J.J.*, 2007-Ohio-535, ¶ 23 (8th Dist.). For instance, a party implicitly waives the issue if the party fails to object to the lack of a timely hearing. *See In re A.P.*, 2006-Ohio-2717, ¶ 13 (12th Dist.) (stating that a party implicitly waives the issue if the party “fails to move for dismissal when it becomes the party’s right to do so”).

{¶46} In the case at bar, appellant’s failure to object to the trial court’s alleged noncompliance with the time periods set forth in R.C. 2151.28(A)(2) means that he implicitly waived, i.e., forfeited, the issue for purposes of appeal. *See generally In re T.D.S.*, 2024-Ohio-595, ¶ 36, quoting *State v. Wintermeyer*, 2019-Ohio-5156, ¶ 10 (“a party ordinarily may not present an argument on appeal that it failed to raise below”); *State v. Rogers*, 2015-Ohio-2459, ¶ 21 (“In contrast to waiver, forfeiture is the failure to timely assert a right or object to an error . . . .”). We thus do not believe that appellant preserved the issue for purposes of appeal.

{¶47} Appellate courts may, however, in certain circumstances, consider a forfeited argument using a plain-error analysis. *See Risner v. Ohio Dept. of Nat. Resources, Ohio Div. of Wildlife*, 2015-Ohio-3731, ¶ 27 (reviewing court has discretion to consider forfeited constitutional challenges);

*State v. Pyles*, 2015-Ohio-5594, ¶ 82 (7th Dist.), quoting *State v. Jones*, 2008-Ohio-1541, ¶ 65 (7th Dist.) (the plain-error doctrine "'is a wholly discretionary doctrine'"); *see also Rosales-Mireles v. United States*, 585 U.S. 129, 135 (2018) (court has discretion whether to recognize plain error).

{¶48} For the plain-error doctrine to apply, the party claiming error must establish (1) that "'an error, i.e., a deviation from a legal rule" occurred, (2) that the error was "'an "obvious" defect in the trial proceedings,'" and (3) that this obvious error affected substantial rights, i.e., the error "'must have affected the outcome of the trial.'" *Rogers*, 2015-Ohio-2459, at ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002); *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982) ("A 'plain error' is obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse [e]ffect on the character and public confidence in judicial proceedings.").

{¶49} The plain-error doctrine is not, however, readily invoked in civil cases. Instead, an appellate court "must proceed with the utmost caution" when applying the plain-error doctrine in civil cases. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997). The Ohio Supreme Court has set a "very high standard" for invoking the plain-error doctrine in a civil case. *Perez v. Falls Financial, Inc.*, 87 Ohio St.3d 371, 375 (2000).

Thus, "the doctrine is sharply limited to the *extremely rare* case involving *exceptional* circumstances where the error," to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby "challenging the legitimacy of the underlying judicial process itself."  (Emphasis in original.) *Goldfuss*, 79 Ohio St.3d at 122-23; *accord Jones v. Cleveland Clinic Found.*, 2020-Ohio-3780, ¶ 24.  Moreover, appellate courts "'should be hesitant to decide [forfeited errors] for the reason that justice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination.'"  *Risner*, 2015-Ohio-3731, at ¶ 28, quoting *Sizemore v. Smith*, 6 Ohio St.3d 330, 332, fn. 2 (1983); *accord Mark v. Mellott Mfg. Co., Inc.*, 106 Ohio App.3d 571, 589 (4th Dist. 1995) ("Litigants must not be permitted to hold their arguments in reserve for appeal, thus evading the trial court process.").  Additionally, courts "should never" apply the plain-error doctrine "to reverse a civil judgment . . . to allow litigation of issues which could easily have been raised and determined in the initial trial."  *Goldfuss*, 79 Ohio St.3d at 122.

{¶50} In the case sub judice, appellant did not argue plain error.  Furthermore, appellant has not cited any authority to support the proposition that a trial court's failure to comply

with the R.C. 2151.28(A)(2) time periods warrants a reversal of a trial court's judgment granting a children services agency permanent custody of a child.  Indeed, R.C. 2151.28(K) states,

> The failure of the court to hold an adjudicatory hearing within any time period set forth in division (A)(2) of this section does not affect the ability of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court.

Consequently, assuming, arguendo, that the trial court erred by failing to hold the adjudicatory hearing within the time period set forth in R.C. 2151.28(A)(2), appellant cannot establish that the error affected his substantial rights.

{¶51} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II

{¶52} In his second assignment of error, appellant asserts that the trial court erred by granting appellee permanent custody of the child when it did not hold the permanent custody hearing within 120 days after appellee filed its permanent custody motion.  He further complains that the court did not issue its permanent custody decision within 200 days after appellee filed its motion.

{¶53} R.C. 2151.414(A)(2) states that a trial court "shall" hold a hearing regarding a permanent custody motion no later than 120 "days after the agency files the motion for permanent

custody, except that, for good cause shown, the court may continue the hearing for a reasonable period of time beyond the one-hundred-twenty-day deadline." The statute further provides that the trial court "shall issue an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order, not later than [200] days after the agency files the motion."

{¶54} In the case at bar, we note that, during the trial court proceedings, appellant did not object to the trial court's alleged failure to comply with these time requirements. We therefore do not believe that appellant preserved the issue for purposes of appeal.

{¶55} Moreover, appellant has not argued plain error, or cited any authority to support the proposition that a trial court's failure to comply with these time periods warrants a reversal of a trial court's judgment granting a children services agency permanent custody of a child. In fact, R.C. 2151.414(A)(2), like R.C. 2151.28(A)(2), states that a court's failure to comply with the time periods set forth above "does not affect the authority of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court." Thus, even if the trial court obviously erred by failing to hold the adjudicatory hearing within the time period

set forth in R.C. 2151.28(A)(2), appellant cannot establish that the error affected his substantial rights.

{¶56} Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.

III

{¶57} In his third assignment of error, appellant asserts that the trial court erred by failing to record the adjudicatory and dispositional hearings.

{¶58} Juv.R. 37(A) requires a juvenile court to "make a record of adjudicatory and dispositional proceedings in abuse, neglect, dependent, unruly, and delinquent cases; permanent custody cases; and proceedings before magistrates."

{¶59} As with his previous two assignments of error, however, appellant did not raise this argument during the trial court proceeding.  He therefore forfeited the issue for purposes of appeal.  Moreover, appellant has not made any argument, or cited any authority to support an argument, that a trial court's failure to record adjudicatory or dispositional hearings warrants a reversal of a trial court's judgment modifying a disposition from temporary custody to permanent custody.[4]

---

[4] We further observe that an appellant generally waives any argument regarding a trial court's failure to comply with the recording requirement when the appellant fails to (1) "invoke the procedures of App.R. 9(C) or 9(E)" or (2) "attempt to reconstruct the missing portions of the record."  *In re B.E.*, 2004-Ohio-3361, ¶ 15.

{¶60} Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.

IV.

{¶61} In his fourth assignment of error, appellant asserts that the trial court "erred and abused its discretion" by determining that granting appellee permanent custody of the child would be in the child's best interest.

A

{¶62} Generally, a reviewing court will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence.[5]  *E.g., In re B.E.*, 2014-Ohio-3178, ¶ 27 (4th Dist.); *In re R.S.*, 2013-Ohio-5569, ¶ 29 (4th Dist.); *accord In re Z.C.*, 2023-Ohio-4703, ¶ 1.

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them.  Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v.*

---

[5] We observe that appellant's assignment of error states that the court "abused its discretion" when it determined that placing the child in appellee's permanent custody would serve his best interest.  As we have noted in the past, however, the abuse-of-discretion standard of review does not apply to an appellate court's review of a trial court's permanent custody judgment.  *See In re B.S.*, 2024-Ohio-5183, ¶ 38 (4th Dist.), citing *In re Z.C.*, 2023-Ohio-4703, ¶ 18.

*Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶63} When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "'"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact finder] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."'" *Eastley*, 2012-Ohio-2179, at ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001), quoting *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *accord In re Pittman*, 2002-Ohio-2208, ¶ 23-24 (9th Dist.). We further observe, however, that issues that relate to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984):

> The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.

**{¶64}** Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997); *accord In re Christian*, 2004-Ohio-3146, ¶ 7 (4th Dist.).

**{¶65}** The question that an appellate court must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is "whether the juvenile court's findings . . . were supported by clear and convincing evidence." *In re K.H.*, 2008-Ohio-4825, ¶ 43.

"Clear and convincing evidence" is

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04 (1986). In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990); *accord In re Holcomb*, 18 Ohio St.3d 361, 368 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954) ("Once the clear and convincing standard

has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."); *In re Adoption of Lay*, 25 Ohio St.3d 41, 42-43 (1986); *compare In re Adoption of Masa*, 23 Ohio St.3d 163, 165 (1986) (whether a fact has been "proven by clear and convincing evidence in a particular case is a determination for the [trial] court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence").

{¶66} Thus, if a children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, the court's decision is not against the manifest weight of the evidence.  *In re R.M.*, 2013-Ohio-3588, ¶ 62 (4th Dist.); *see also In re R.L.*, 2012-Ohio-6049, ¶ 17 (2d Dist.), quoting *In re A.U.*, 2008-Ohio-187, ¶ 9 (2d Dist.) ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements . . . have been established.'").

{¶67} Once a reviewing court finishes its examination, the judgment may be reversed only if it appears that the fact finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175. A reviewing court should find a trial court's permanent custody judgment against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'" *Id.*, quoting *Martin*, 20 Ohio App.3d at 175; *see Black's* (12th ed. 2024) (the phrase "manifest weight of the evidence" "denotes a deferential standard of review under which a verdict will be reversed or disregarded only if another outcome is obviously correct and the verdict is clearly unsupported by the evidence").

B

{¶68} Courts must recognize that "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by th[e United States Supreme] Court.'" *In re B.C.,* 2014-Ohio-4558, ¶ 19, quoting *Troxel*, 530 U.S. at 65. Indeed, "the right to raise one's children is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *accord In re Hayes*, 79 Ohio

St.3d 46, 48 (1997); *see Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("natural parents have a fundamental right to the care and custody of their children"). Thus, "parents who are 'suitable' have a 'paramount' right to the custody of their children." *B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97 (1977), citing *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877); *Murray*, 52 Ohio St.3d at 157.

{¶69} A parent's rights, however, are not absolute. *In re D.A.*, 2007-Ohio-1105, ¶ 11. Rather, "'it is plain that the natural rights of a parent . . . are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974). Thus, the State may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶ 11.

{¶70} Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. *Id.* Additionally, when considering whether to grant a children services agency permanent custody, a trial court should

consider the underlying purposes of R.C. Chapter 2151:  "to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.'"  *In re C.F.*, 2007-Ohio-1104, ¶ 29, quoting R.C. 2151.01(A).

C

{¶71} A children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect, or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody. In this case, appellee sought permanent custody by filing a motion under R.C. 2151.413.  When an agency files a permanent custody motion under R.C. 2151.413, R.C. 2151.414 applies.  R.C. 2151.414(A).

1

{¶72} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that any one of the following factors applies:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the

temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . .

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶73} In the case at bar, appellant challenges the trial court's finding under R.C. 2151.414(B)(1)(a) through (e). Appellant recognizes that the court found that the child had been in appellee's temporary custody for 12 or more months of a consecutive 22-month period, but he claims that it is "quite hypocritical to consider this time frame while ignoring the statutory time frame which the agency and the Court ignored repeatedly." He further contends that the trial court failed to consider "that the child could be placed with [him] within a reasonable period of time."

{¶74} Appellant apparently believes that the trial court should have found that, even if R.C. 2151.414(B)(1)(d) applied,

it nonetheless could have placed the child with him within a reasonable time; and thus, the court should not have found that one of the R.C. 2151.414(B)(1)(a) through (e) factors applied. Appellant, however, cites no authority to support this proposition. Additionally, his argument conflicts with the plain language of the statute. We therefore reject this assertion.

2

{¶75} Appellant next contends that the trial court did not properly analyze the best interest factors. He asserts that his daughter testified that appellant possessed the ability to parent the child. Appellant further argues that he can provide the child with a legally secure permanent placement.

{¶76} R.C. 2151.414(D) lists the factors that a trial court considers when determining whether permanent custody will serve a child's best interest. The statute directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interest will be served by granting a children services agency permanent custody. The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's

guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶77} Courts that must determine whether a grant of permanent custody to a children services agency will promote a child's best interest must consider "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *C.F.*, 2007-Ohio-1104, at ¶ 57, citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56; *accord In re C.G.*, 2008-Ohio-3773, ¶ 28 (9th Dist.); *In re N.W.*, 2008-Ohio-297,¶ 19 (10th Dist.). However, none of the best interest factors is entitled to "greater weight or heightened significance." *C.F.* at ¶ 57. Instead, the trial court considers the totality of the circumstances when making its best interest determination. *See Schaefer* at  ¶ 63-64 (endorsing the trial court's "totality of the circumstances" approach to evaluating the best interest factors); *In re K.M.*, 2017-Ohio-1336, ¶ 51 (4th Dist.), citing *In re K.M.S.*, 2017-Ohio-142, ¶ 24 (3d Dist.).  In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.),

citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324 (1991).  Indeed, "'[t]here is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current "home," under the care of his parents or foster parents, especially when such uncertainty is prolonged.'"  *B.C.,* 2014-Ohio-4558, at ¶ 20, quoting *Lehman v. Lycoming Cty. Children's Servs. Agency,* 458 U.S. 502, 513-14 (1982).

{¶78} We further observe that the statutory best interest factors focus upon the child, not the parent.  *See id.* ("parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights").  Indeed, R.C. 2151.414(C) specifically prohibits a court from "consider[ing] the effect the granting of permanent custody to the agency would have upon any parent of the child."

{¶79} As we explain below, we do not agree with appellant that the trial court's best interest determination is against the manifest weight of the evidence.

Child's Interactions and Interrelationships

{¶80} The evidence indicates that the child shares a positive relationship with his foster family.  The child's therapist indicated that he is doing well in the foster home, and the foster mother testified that the child is bonded to her

and to the remaining members of the family.

{¶81} Appellant has not been involved in the child's life for a significant period of time and has thus not developed a strong bond with the child.  In April 2022, when the child was about a year and a half old, the child's mother informed appellant that he is the father.  At that point, appellant attempted to become involved in the case.  To that end, he contacted the caseworker, and the caseworker advised appellant of the steps that he needed to take to be added to the case, including obtaining a DNA test and requesting an attorney. After appellant's initial contact with the caseworker, appellant allowed approximately 11 months to elapse before he next contacted the caseworker.

{¶82} In October 2023, appellant started supervised visits with the child.  The caseworker described appellant's interaction with the child as "very hit and miss."  He explained that appellant "[s]ometimes [was] attentive" to the child, but "other times," he was "very standoffish" and did not seem to "know how to appropriately interact."  Furthermore, appellant did not appear to have any bond with the child.

{¶83} We additionally observe that the child's GAL reported that appellant had "not been invested in his son's visits until Oct/Nov of 2023."  The GAL further indicated that appellant "has known since the conception of [the child] that he could be [the

child]'s father, but he has allowed his child to live in foster care during some of his most formative years."

{¶84} Appellant's daughter testified and claimed that appellant would be able to properly parent the child. The trial court, however, apparently did not find the daughter's testimony to be persuasive in light of current circumstances.

## Children's Wishes

{¶85} The child was too young to be able to express his wishes directly. The GAL recommended that the court place the child in the agency's permanent custody. *See C.F.*, 2007-Ohio-1104, at ¶ 55 (R.C. 2151.414 "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem"); *In re S.M.*, 2014-Ohio-2961, ¶ 32 (4th Dist.) (recognizing that R.C. 2151.414 permits juvenile courts to consider a child's wishes as child directly expresses or through the GAL).

## Custodial History

{¶86} The child lived with the mother until his October 2021 removal. Since that time, he has remained in appellee's temporary custody. Thus, when appellee filed its February 2024 permanent custody motion, the child had been in its temporary custody for more than two years. We further note that, at the time of the January 2025 hearing, the child had been in appellee's temporary custody for more than three years. *See*

R.C. 2151.415(D)(4) (prohibiting a court from continuing "an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier"); *see also In re Adams*, 2007-Ohio-4840, ¶ 22 ("no more than two extensions of a temporary-custody order may be given").

Legally Secure Permanent Placement

{¶87} "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.), citing *In re Dyal*, 2001 WL 925423, *9 (4th Dist. Aug. 9, 2001) ("legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 2015-Ohio-4682, ¶ 28 (10th Dist.) (legally secure permanent placement requires more than a stable home and income, but also requires an environment that will provide for a child's needs); *In re J.H.*, 2013-Ohio-1293, ¶ 95 (11th Dist.) (mother was unable to provide legally secure permanent placement when she lacked physical and emotional stability and father was unable to do so when he lacked grasp of parenting concepts); *In re J.W.*, 2007-Ohio-2007, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (legally secure permanent placement means "a placement that is stable and consistent");

*Black's* (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *id.* (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *M.B.,* 2016-Ohio-793, at ¶ 56 (4th Dist.).

{¶88} In the case at bar, we believe that the evidence presented at the hearing supports the trial court's finding that the child needs a legally secure permanent placement and that the mother could not provide the child with this type of placement. The mother lacked independent housing and failed to maintain sobriety. Thus, she could not provide the children with a legally secure permanent placement.

{¶89} The evidence regarding appellant's ability to provide the child with a legally secure permanent placement is less clear. Appellant appears to have a physically appropriate home for the child, and appellee did not identify any safety concerns that the home posed. However, the child's caseworker did not

observe a bond between appellant and the child and reported that appellant sometimes appeared detached and disengaged during visits with the child. Furthermore, the trial court expressed concern that appellant allowed approximately 11 months to elapse between his first and second contacts with the child's caseworker. Given these findings, the trial court reasonably could have determined that appellant may not have demonstrated the resolve needed to provide the child with a legally secure permanent placement.

{¶90} Additionally, even if appellant could provide a legally secure permanent placement for the child, the trial court was not required to conclude that any ability that appellant had to provide the child with a legally secure permanent placement meant that denying appellee's permanent custody motion would serve the child's best interest. *See* *Schaefer*, 2006-Ohio-5513, at ¶ 56 (the statute does not give "heightened importance" to R.C. 2151.414(D)(4), and a trial court need not "credit evidence in support of maintaining the parental relationship when evidence supporting termination outweighs it clearly and convincingly").

R.C. 2151.414(E)(7) to (11)

{¶91} R.C. 2151.414(D)(1)(e) requires a trial court to consider whether any of the factors listed in R.C. 2151.414(E)(7) through (11) apply. Those provisions list

parental conduct that may lead a court to conclude that placing a child in a children services agency's permanent custody would be in a child's best interest. The parental conduct listed in R.C. 2151.414(E)(7) through (11) includes situations in which the parent (1) had been convicted of or pleaded guilty to certain criminal offenses against the child, the child's sibling, or another child who lived in the parent's household, (2) withheld medical treatment or food from the child, (3) repeatedly placed the child at substantial risk of harm because of alcohol or drug abuse, (4) abandoned the child, and (5) had parental rights involuntarily terminated with respect to a sibling of the child.

{¶92} In the case sub judice, the trial court did not make any R.C. 2151.414(E)(7) through (11) finding with respect to appellant.

{¶93} Based upon all of the foregoing factors, the trial court could have formed a firm belief that placing the children in appellee's permanent custody was in their best interest. As the trial court recognized, the child, who was about 14 months of age at the time of his removal, spent more than two years living with the same foster family. At the time of the July 2024 permanent custody hearing, the child had been in appellee's temporary custody for nearly three years. By the time that the trial court issued its July 2025 judgment, the child had been in

appellee's temporary custody—and the same foster home—for nearly

four years.  Thus, the child has spent the majority of his young

life with the foster family.  Moreover, the child has developed

a bond with the foster family, and the trial court rationally

could have determined that uprooting the child from the foster

home would not be in the child's best interest.  Although

appellant does not appear to have the same problems that plague

other parents facing the termination of their parental rights,

appellant has not established that the evidence weighs heavily

against the trial court's judgment.  Given all of these

circumstances and those outlined above, we do not believe that

the trial court's judgment is against the manifest weight of the

evidence.

3

{¶94} Appellant next asserts that the trial court erred by

"granting permanent custody, pursuant to R.C. 2151.414(2)(e)

[sic]."  Appellant contends that the court "failed to identify

by clear and convincing evidence that one or more of the factors

exist [and] the child cannot be placed with one of the parents

within a reasonable time or should not be with either parent."

{¶95} Appellant's argument appears to be based upon R.C.

2151.414(D)(2).  That provision reads as follows:

> If all of the following apply, permanent custody is
> in the best interest of the child, and the court shall
> commit the child to the permanent custody of a public

children services agency or private child placing agency:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

{¶96} R.C. 2151.414(D)(2) thus specifies the circumstances that require a trial court to commit a child to an agency's permanent custody. This provision provides an alternative to R.C. 2151.414(D)(1), and, therefore, a trial court need not find that both R.C. 2151.414(D)(1) and (2) apply before it may place a child in an agency's permanent custody. *See In re A.P.*, 2025-Ohio-2125, ¶ 33 (4th Dist.); *see, e.g., In re C.W.*, 2024-Ohio-4987, ¶ 50 (1st Dist.) (a trial court need not "make both a discretionary and a mandatory best-interest determination"). Instead, either best interest finding suffices. *See In re K.M.*, 2024-Ohio-2137, ¶ 44 (10th Dist.) ("the best interest of the child finding under R.C. 2151.414(D)(2) is sufficient to support granting [a permanent custody] motion alone").

{¶97} In the case at bar, the trial court applied R.C. 2151.414(D)(1), not R.C. 2151.414(D)(2). We therefore disagree

with appellant that the trial court also was required to find that the circumstances listed in R.C. 2151.414(D)(2) applied.

{¶98} Accordingly, based upon the foregoing reasons, we overrule appellant's fourth assignment of error.

V

{¶99} In his fifth assignment of error, appellant asserts that the trial court erred by determining that the child could not be placed with him within a reasonable time or should not be placed with him.

{¶100} We first note that appellant does not cite the statute that he claims required the trial court to assess whether the child could be placed with him within a reasonable time or should not be placed with him.  Nevertheless, his argument appears to be based upon the circumstance specified in R.C. 2151.414(B)(1)(a).  As we indicated above, that provision permits a trial court to place a child in an agency's permanent custody if doing so is in the child's best interest and

> [t]he child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period, . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶101} We observe that R.C. 2151.414(B)(1) requires the trial court to find the existence of only one of the factors listed in R.C. 2151.414(B)(1)(a) to (e).  *See In re W.W.*, 2011-

Ohio-4912, ¶ 54 (1st Dist.) (if one of R.C. 2151.414(B)(1)

factors exists, a court need not find that other (B)(1) factors

apply). Consequently, if the court finds that R.C.

2151.414(B)(1)(d) applies, then it need not also find that the

child cannot be placed with either parent or should not be

placed with either parent. *See In re A.P.*, 2022-Ohio-1577, ¶ 36

(4th Dist.). Moreover, R.C. 2151.414(B)(1)(a), by its terms, is

inapplicable if a child has been in an agency's temporary

custody for 12 or more months of a consecutive 22-month period.

*See In re B.S.*, 2024-Ohio-5183, ¶ 54 (4th Dist.), quoting *In re*

*N.S.N.*, 2015-Ohio-2486, 2015 WL 3856558, ¶ 52 (4th Dist.)

("'under the plain language of R.C. 2151.414(B)(1)(d), when a

child has been in a children services agency's temporary custody

for [12] or more months of a consecutive [22]-month period, a

trial court need not find that the child cannot or should not be

placed with either parent within a reasonable time'").

{¶102} In the case at bar, the trial court found that

2151.414(B)(1)(d) applied because the child had been in

appellee's temporary custody for more than 12 months of a

consecutive 22-month period. The court did not determine that

any other factor under R.C. 2151.414(B)(1)(a) through (e)

applied. Thus, contrary to appellant's argument, the trial

court did not find, and was not required to find, that the child

could not be placed with him within a reasonable time or should

not be placed with him.  *See generally In re C.W.*, 2004-Ohio-6411, ¶ 21 (under "the '12 of 22' provision to R.C. 2151.414, an agency need no longer prove that a child cannot be returned to the parents within a reasonable time or should not be returned to the parents, so long as the child has been in the temporary custody of an agency for at least 12 months").

{¶103} Accordingly, based upon the foregoing reasons, we overrule appellant's fifth assignment of error.

VI

{¶104} In his sixth assignment of error, appellant asserts that the trial court erred by concluding that appellee made reasonable efforts to reunify him with the child.

{¶105} When a trial court "removes a child from the child's home or continues the removal of a child from the child's home," R.C. 2151.419(A)(1) requires a trial court to determine whether a children services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home."  "In determining whether reasonable efforts were made, the child's health and safety shall be paramount."  R.C. 2151.419(A)(1). The agency bears the burden to prove that it has made reasonable efforts.  R.C. 2151.419(A)(1).

{¶106} However, R.C. 2151.419(A)(1) applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children . . . ." *In re C.F.*, 2007-Ohio-1104, ¶ 41; *accord In re C.B.C.*, 2016-Ohio-916, ¶ 72 (4th Dist.). Thus, "'[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *C.F.* at ¶ 41, quoting *In re A.C.*, 2004-Ohio-5531, ¶ 30 (12th Dist.). Nonetheless, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts" before it seeks permanent custody. *Id.* at ¶ 42. Instead, at prior "stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification." *Id.* Additionally, "[if] the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

{¶107} In the case sub judice, appellant's appeal does not originate from one of the types of hearings specifically listed in R.C. 2151.419(A): "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children." Appellee, therefore,

did not have the burden to prove at the permanent custody hearing that it used reasonable efforts to reunify the family, unless it had not previously done so.

{¶108} Our review of the record reflects that, before the agency filed its permanent custody motion, the trial court made multiple reasonable efforts findings.  Thus, the court did not need to again find that the agency used reasonable efforts before it could grant the agency permanent custody of the child. *E.g., In re M.H.-L.T.*, 2017-Ohio-7825, ¶ 64 (4th Dist.); *In re S.S.*, 2017-Ohio-2938, ¶ 168 (4th Dist.).

{¶109} We also observe that appellant does not cite any authority to support his argument that a trial court must enter a finding that an agency used reasonable efforts to place a child with a parent who was not living in the home from which the child was removed.  "Appellate courts should not perform independent research to create an argument for a litigant." *State v. Sims*, 2023-Ohio-1179, ¶ 109 (4th Dist.), citing *State v. Quarterman*, 2014-Ohio-4034, ¶ 19, quoting *State v. Bodyke*, 2010-Ohio-2424, ¶ 78 (O'Donnell, J., concurring in part and dissenting in part), quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) ("'"appellate courts do not sit as self-directed boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them"'"); *accord State v. Lykins*, 2019-

Ohio-3316, ¶ 57 (4th Dist.).   "[W]e cannot write a party's

brief, pronounce ourselves convinced by it, and so rule in the

party's favor.   That's not how an adversarial system of

adjudication works."   *Xue Juan Chen v. Holder*, 737 F.3d 1084,

1085 (7th Cir. 2013).

{¶110} Because appellant did not cite authority to support

his sixth assignment of error, we are unable to agree with

appellant's assertion.   *See In re Application of Columbus S.

Power Co.*, 2011-Ohio-2638, ¶ 14 (failing to cite legal authority

or present argument that a legal authority applies is grounds to

reject a claim); *Robinette v. Bryant*, 2015-Ohio-119, ¶ 33 (4th

Dist.) ("It is within our discretion to disregard any assignment

of error that fails to present any citations to cases or

statutes in support").

{¶111} Furthermore, as we noted in *In re C.B.C.*,

> [I]n *C.F.*, at ¶ 4, the Ohio Supreme Court held that
> "except for some narrowly defined statutory exceptions,
> the state must make reasonable efforts to reunify the
> family before terminating parental rights."   However,
> the reasonable efforts statute, R.C. 2151.419, does not
> use the phrase "reunify the family."   Instead, it
> requires the agency to use reasonable efforts "to
> prevent the removal of the child from the child's home,
> to eliminate the continued removal of the child from the
> child's home, or to make it possible for the child to
> return safely home."   This raises a question as to what
> is meant by "family," what is meant by "home," and
> whether the *C.F.* duty "to reunify the family" extends to
> all family members, including a parent with whom the
> child was not living at the time of removal, or just to
> the family member from whose care the child was removed.
> *See generally In re M.R.,* 3rd Dist. Defiance No. 4-11-

12, 2011-Ohio-6528, ¶¶ 15 and 17; *In re A.P.,* 9th Dist. Medina No. 12CA0022-M, 2012-Ohio-3873, ¶¶ 28-29; R.C. 2151.419(B) (stating that trial court's reasonable efforts finding shall briefly describe the services provided to "the family of the child"). None of the parties, however, have raised any of these issues. We therefore do not address them now. *See Risner, supra,* at ¶ 28.

2016-Ohio-916, ¶ 82 (4th Dist.). Likewise, in the case at bar, none of the parties has raised these issues, so we do not address them.

{¶112} Accordingly, based upon the foregoing reasons, we overrule appellant's sixth assignment of error.

VII

{¶113} In his seventh assignment of error, appellant asserts that the trial court abused its discretion by considering the GAL's report. Appellant asserts that the GAL "failed to competently perform her duties."

{¶114} A GAL's primary duty in a permanent custody proceeding is "to protect the interest of the child." R.C. 2151.281(B)(1); *accord In re C.B.,* 2011-Ohio-2899, ¶ 14 (a GAL's "purpose is to protect the interest of the child"). The GAL must "perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services" that the agency provided the child, "and shall file any motions and other court papers that are in

the best interest of the child." R.C. 2151.281(I). If the GAL

fails "to faithfully discharge the guardian ad litem's duties,"

the court "shall discharge the guardian ad litem and appoint

another guardian ad litem." R.C. 2151.281(D).

{¶115} Additionally, Sup.R. 48.03(D) contains a

nonexhaustive listing of a GAL's duties:

> (1) Become informed about the facts of the case and contact all relevant persons;
> (2) Observe the child with each parent, foster parent, guardian or physical custodian;
> (3) Interview the child, if age and developmentally appropriate, where no parent, foster parent, guardian, or physical custodian is present;
> (4) Visit the child at the residence or proposed residence of the child in accordance with any standards established by the court;
> (5) Ascertain the wishes and concerns of the child;
> (6) Interview the parties, foster parents, guardians, physical custodian, and other significant individuals who may have relevant knowledge regarding the issues of the case. The guardian ad litem may require each individual to be interviewed without the presence of others. Upon request of the individual, the attorney for the individual may be present.
> (7) Interview relevant school personnel, medical workers, and court personnel and obtain copies of relevant records;
> (8) Review pleadings and other relevant court documents in the case;
> (9) Obtain and review relevant criminal, civil, educational, mental health, medical, and administrative records pertaining to the child and, if appropriate, the family of the child or other parties in the case;
> (10) Request that the court order psychological evaluations, mental health substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court;
> (11) Review any necessary information and interview other persons as necessary to make an informed recommendation regarding the best interest of the child.

{¶116} In the case at bar, even if the GAL failed to comply with any of the foregoing responsibilities, "this court, along with other Ohio appellate courts, has refused to recognize purported Sup.R. 48.03(D) violations as reversible error." *In re C.H., Jr.*, 2026-Ohio-81, ¶ 94 (4th Dist.); *e.g., In re A.A.*, 2024-Ohio-224, ¶ 50 (10th Dist.); *In re S.W.*, 2023-Ohio-793, ¶ 45 (4th Dist.). Therefore, even if the GAL failed to comply with some of the duties listed in Sup.R. 48.03(D), the failure to comply with this superintendence rule does not constitute reversible error.

{¶117} We further observe that, at the permanent custody hearing, appellant's counsel questioned the GAL regarding the extent of her investigation and made the trial court well-aware of appellant's belief that the GAL did not adequately investigate the child's situation. As the trier of fact, the trial court's role is "to assign weight to the guardian ad litem's testimony and recommendation." *In re C.W.*, 2025-Ohio-282, ¶ 46 (10th Dist.). Thus, a trial court has discretion to consider a GAL's report and recommendation, even if the GAL fails to comply with Sup.R. 48.03. *C.H., Jr.*, 2026-Ohio-81, at ¶ 74 (4th Dist.); *see also In re K.A.*, 2021-Ohio-1773, ¶ 47 (5th Dist.) ("the trial court, as the trier of fact, is permitted to assign weight to the GAL's testimony and recommendation and to

consider it in the context of all the evidence before the court"). Therefore, in the case sub judice, even if the GAL failed to fully comply with Sup.R. 48.03, we do not find anything in the record to suggest that the trial court abused its discretion by considering the GAL's recommendation.

{¶118} Accordingly, based upon the foregoing reasons, we overrule appellant's seventh assignment of error.

## VIII

{¶119} In his eighth assignment of error, appellant asserts that he did not receive the effective assistance of counsel. He claims that trial counsel was ineffective because "no one had the capacity to see what occurred at the adjudication or disposition hearing since it had not been recorded." Appellant further states that trial counsel was ineffective for failing to (1) "file the closing argument brief to the Court," (2) object to the timing of the adjudication, (3) object to appellee's failure to file a case plan, and (4) object to appellee's failure to add him to the case plan.

{¶120} The right to counsel, guaranteed in permanent custody proceedings by R.C. 2151.352 and by Juv.R. 4, includes the right to the effective assistance of counsel. *In re Wingo*, 143 Ohio App.3d 652, 666 (4th Dist.2001), citing *In re Heston*, 129 Ohio App.3d 825, 827 (1st Dist.1998); *e.g., In re J.P.B.*, 2013-Ohio-787, ¶ 23 (4th Dist.). "'Where the proceeding contemplates the

loss of parents' 'essential' and 'basic' civil rights to raise their children, . . . the test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody.'" *Wingo*, 143 Ohio App.3d at 666, quoting *Heston*.

{¶121} To establish constitutionally ineffective assistance of counsel, a defendant must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *E.g., Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Obermiller*, 2016-Ohio-1594, ¶ 83. "Failure to establish either element is fatal to the claim." *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.). Therefore, if one element is dispositive, a court need not analyze both. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000) (stating that a defendant's failure to satisfy one of the elements "negates a court's need to consider the other").

{¶122} "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." (Citations omitted.) *State v. Conway*, 2006-Ohio-2815, ¶ 95; *accord Hinton v. Alabama*, 571 U.S. 263, 272 (2014). Furthermore, "'[i]n any case presenting an ineffectiveness claim, the performance

inquiry must be whether counsel's assistance was reasonable considering all the circumstances.'" *Hinton*, 571 U.S. at 273, quoting *Strickland*, 466 U.S. at 688. Additionally, "[a] properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor*, 2008-Ohio-482, ¶ 10 (4th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were "so serious" that counsel failed to function "as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *e.g., Obermiller* at ¶ 84; *State v. Gondor*, 2006-Ohio-6679, ¶ 62; *State v. Hamblin*, 37 Ohio St.3d 153, 156 (1988).

{¶123} To establish prejudice, a defendant must demonstrate that a reasonable probability exists that "'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Hinton*, 571 U.S. at 275, quoting *Strickland*, 466 U.S. at 694; *e.g., State v. Short*, 2011-Ohio-3641, ¶ 113; *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. Furthermore, courts ordinarily may not simply presume the existence of prejudice but must require the defendant to affirmatively establish prejudice. *State v. Clark*, 2003-Ohio-1707, ¶ 22 (4th Dist.). As we have repeatedly recognized, speculation is

insufficient to demonstrate the prejudice component of an
ineffective assistance of counsel claim. *E.g., State v.
Jenkins*, 2014-Ohio-3123, ¶ 22 (4th Dist.); *State v. Simmons*,
2013-Ohio-2890, ¶ 25 (4th Dist.); *accord State v. Powell*, 2012-
Ohio-2577, ¶ 86 (an argument that is purely speculative cannot
serve as the basis for an ineffectiveness claim).

{¶124} With respect to appellant's assertion that trial
counsel was ineffective for failing to file a written closing
argument, we observe that the record shows that, on February 10,
2025, appellant's counsel filed a written closing argument
(entitled "Conclusory Statement").  We therefore reject
appellant's argument that trial counsel was ineffective for
failing to file a written closing argument.

{¶125} Regarding appellant's remaining ineffectiveness
claims, we do not believe that appellant has established that a
reasonable probability exists that, but for counsel's alleged
deficiencies, the result of the proceeding would have been
different.  We note that the trial court did not appoint counsel
to represent appellant until March 2024, after appellee had
filed its permanent custody motion.  At that time, the child had
been in appellee's temporary custody for more than two years.
As we explained above, the record contains competent and
credible evidence to support the trial court's decision that
placing the child in appellee's permanent custody would serve

the child's best interest.  Thus, even if appellant's trial counsel had raised every argument or objection that appellant now states that counsel should have raised, we do not believe that the outcome of the proceeding would have been different.

{¶126} We further observe that appellant did not cite any authority, beyond general authority regarding the standard for establishing ineffective assistance of counsel, to support his assertions that trial counsel was ineffective for failing to raise the above arguments or objections.  Because appellant has not cited any authority that supports his claimed instances of ineffective assistance of counsel, we are unable to agree with appellant's conclusory arguments.  *See In re Application of Columbus S. Power Co.*, 2011-Ohio-2638, at ¶ 14; *Robinette*, 2015-Ohio-119, at ¶ 33 (4th Dist.).

{¶127} Accordingly, based upon the foregoing reasons, we overrule appellant's eighth assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.